**Candy ZIOLKOWSKI, Appellant–Respondent,**

v.

**HEARTLAND REGIONAL MEDICAL CENTER, Respondent–Appellant.**

**Diana Munford and Medical Staffing Network, Inc., Respondent–Appellant.**

**Nos. WD 70708, WD 70745, WD 70766.**

Missouri Court of Appeals, Western District.

Aug. 10, 2010.

---

Sophie Woodworth, Esq., Thomas F. Ralston, Esq., Anne Schiavone, Esq., and Richard H. Ralston, Esq., Kansas City, MO, for appellant.

Mariam A. Decker, Esq., Bruce Farmer, Esq., Columbia, MO and Sean T. McGrevey, Esq., Overland Park, KS, for respondent.

Before: LISA WHITE HARDWICK, P.J., and JAMES M. SMART, JR. and ALOK AHUJA, JJ.

ALOK AHUJA, Judge.

Candi Ziolkowski, the plaintiff below, appeals the judgment entered following a jury trial in favor of defendants Heartland Regional Medical Center, Medical Staffing Network, Inc. ("MSN"), and Nurse Diana Munford. Ziolkowski sued the defendants for allegedly violating § 191.656[1] when Munford, as an agent of Heartland and an employee of MSN, improperly disclosed Ziolkowski's HIV-positive status to third parties. Ziolkowski argues that two of the trial court's evidentiary rulings were erroneous and justify a new trial, alone or together. We affirm.[2]

## Factual Background

Ziolkowski is a twenty-three year old, HIV-infected female. On the afternoon of May 28, 2006, she severely injured her right arm when it went through a plate glass window. She sought medical treatment at Heartland, and underwent surgery to treat her injury. After some time in a recovery room, she was transferred in the early morning of May 29 to an inpatient room on the hospital floor.

Defendant Diana Munford, R.N., was Ziolkowski's nurse after her arrival on the floor. Nurse Munford was not a Heartland employee, but instead worked at the hospital as an independent contractor through her employment with Intelistaf, now known as MSN.

Ziolkowski's brother, Kyle Jones, and her boyfriend, Jamel Fleming, stayed with her in the hospital room that night. During the night, Ziolkowski's aunt Diane Jones, who worked in custodial services at Heartland, also visited her.

At some point that night, Nurse Munford and Ziolkowski discussed her HIV-positive status in her hospital room, although the substance of what Nurse Munford said, the manner in which she spoke, and whether anyone witnessed or heard her comments, were disputed at trial. Ziolkowski also contended that Munford announced her HIV-positive status in a hallway while transporting Ziolkowski from a surgical recovery room to her hospital room. Both Munford and Ziolkowski agree that they also discussed Ziolkowski's HIV-positive status in the bathroom of her room following their conversation in the hospital room, at which point Ziolkowski stated that at least one of her visitors did not know that she was HIV positive.

There is further disagreement as to what occurred after that conversation in the bathroom. Ziolkowski claims she was extremely upset following Nurse Munford's comments in front of her visitors, and she denied seeing Nurse Munford or any other health care provider for the rest of the night. Munford testified that after the conversation in the bathroom, she continued interacting with Ziolkowski for several hours, during which time Ziolkowski was not crying, hysterical, or angry, and that her nursing notes confirmed this.

Ziolkowski filed suit against the defendants, alleging that Nurse Munford improperly disclosed her HIV-positive status to her brother, Kyle Jones, and her aunt,

1. Statutory references are to the RSMo 2000, as updated through the 2009 Cumulative Supplement.

2. On July 22, 2010, Defendant–Respondent/Cross–Appellant MSN filed a Suggestion of Bankruptcy, indicating that it had filed a voluntary Chapter 11 petition in the Bankruptcy Court for the Southern District of Florida on July 2, 2010. As a result of that bankruptcy filing, further proceedings involving MSN have been stayed in this Court. This opinion does not directly address issues concerning Ziolkowski's claims against MSN, whether raised in the principal appeal (No. WD70708), or in the cross-appeal filed by Munford and MSN (No. WD70745).

Diane Jones. Ziolkowski's single-count petition was based on § 191.656, which provides that "[a]ll information known to ... any person ... concerning an individual's HIV infection status or the results of any individual's HIV testing shall be strictly confidential and shall not be disclosed except" in identified circumstances. § 191.656.1(1). The statute creates a private civil right of action for persons aggrieved by a violation of this confidentiality obligation. § 191.656.6.

The case was tried to a jury. The jury returned a verdict which found in favor of Nurse Munford on Ziolkowski's claim against her. Because of this finding, and given the structure of the verdict form, the jury did not answer whether Munford or MSN were liable for punitive damages, or whether Heartland was "responsible for the conduct of Diana Munford." The circuit court entered judgment for all defendants in accordance with the jury's verdict.

### Analysis

On appeal, Ziolkowski alleges that the trial court erred in excluding the testimony of one of her witnesses, Kimberly Barron, and in permitting defense counsel to impeach Ziolkowski with an alleged inconsistent statement from the records of later medical treatment, which reported Ziolkowski's explanation of the cause of her May 28, 2006 injury. Ziolkowski also argues that the cumulative effect of the trial court's erroneous evidentiary rulings justifies a new trial. In addition to defending the trial court's evidentiary rulings, Heartland and Munford argue that the judgment can be affirmed on alternative grounds. Because we find that the evidentiary rulings Ziolkowski challenges cannot justify reversal, we affirm without addressing the merits of the defendants' alternative arguments.

We review the trial court's admission or exclusion of evidence under a deferential standard of review.

> The trial court is accorded considerable discretion in ruling on the admissibility of evidence, particularly where a subjective determination of relevancy must be made. Unless that discretion is abused, the exclusion of evidence on relevancy grounds is not a basis for reversal. On appellate review, the issue is not whether the evidence was admissible, it is whether the trial court abused its discretion in excluding the evidence.

*Rock v. McHenry*, 115 S.W.3d 419, 420 (Mo.App. W.D.2003) (citations omitted).

> When reviewing for an "abuse of discretion" we presume the trial court's finding is correct, and reverse only when the ruling is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." Upon finding an abuse of discretion, this court will reverse only if the prejudice resulting from the improper admission of evidence is outcome-determinative.

*Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 872 (Mo.App. E.D.2009) (citations omitted).

### I.

Ziolkowski first complains about the trial court's exclusion of Kimberly Barron's testimony. Barron, who is herself a nurse, became the Patient Advocate for Heartland on June 7, 2006, more than a week after Nurse Munford's alleged disclosures. She met with Ziolkowski and her mother shortly thereafter to discuss Ziolkowski's complaints concerning Nurse Munford's

actions. Barron was not present when the alleged disclosures occurred.

Ziolkowski made an extensive offer of proof at trial concerning Barron's excluded testimony. As reflected in Barron's testimonial offer of proof, she generally would have testified: (1) that prior to Nurse Munford's alleged disclosures, she had witnessed other nurses at Heartland openly discussing confidential patient information, and had done so herself; (2) the hospital was non-responsive to Ziolkowski's complaints, and suggested to Barron that she provide misleading information to Ziolkowski to placate her or delay her pursuit of her grievance; (3) that, impressed by the devastating effect on Ziolkowski of such inappropriate disclosures, Barron has changed her own nursing practices and become more sensitive to patient confidentiality; and (4) that Barron came to the conclusion that the Patient Advocate position had been established by Heartland merely as a "risk management" tool, and that Barron was disciplined for too aggressively pursuing resolution of patient complaints, including Ziolkowski's.

Ziolkowski argues on appeal that Barron's testimony was relevant both to the issues of the defendants' liability, and also to punitive damages. We conclude, however, that Ziolkowski is procedurally barred from raising these arguments. As to the relevance of Barron's testimony to liability issues, Ziolkowski failed to adequately argue this basis for admissibility in the trial court, and we accordingly will not consider it here. Because the jury never reached the issue of defendants' liability for punitive damages, any relevance Barron's testimony may have had to punitive damages issues cannot justify reversal.

### A.

■ Ziolkowski argues that Barron's testimony "clearly would have established it was more likely true than not true that a disclosure did in fact occur in violation of Missouri law." In particular, Ziolkowski argues that the permissive attitude to the disclosure of confidential patient information which Barron observed at Heartland (although none apparently involving Nurse Munford) made it more likely that the disclosures Ziolkowski alleged actually occurred. According to Ziolkowski, this evidence would also have responded to the defendants' claims at trial that nurses were trained and expected to respect patient confidentiality. Ziolkowski argues that Heartland's purportedly misleading and evasive responses to the concerns Barron raised, which she labels a "cover-up," supports an inference that Heartland was aware that Munford had acted improperly (analogous to the "consciousness of guilt" inference a jury may be entitled to draw in criminal cases from a defendant's flight, attempt to conceal evidence, or untrue exculpatory statements).

The problem with these arguments is that Ziolkowski did not preserve them in the trial court. The issue of the admissibility of evidence concerning Heartland's investigation of, and response to, Ziolkowski's complaints was discussed immediately prior to the beginning of trial. At that time, Ziolkowski argued only that evidence of Heartland's post-incident conduct would be relevant and admissible to her punitive damages claim. The court rejected Ziolkowski's argument that such punitive damages-related evidence was admissible in the first phase of the bifurcated trial. When Ziolkowski's counsel asked the court for clarification whether it could nevertheless present evidence of the "things that Heartland did that corroborate ... that this disclosure took place," the court responded that it would allow "[a]nything that goes—that's relevant to Nurse Munford's conduct."

During trial, when Ziolkowski sought to call Barron to the stand, the defendants objected. Ziolkowski's counsel responded:

[Plaintiff's counsel]: She was the Patient Advocate. She is in defendant's employ. She's in defendant's employ right now. She's here under subpoena for us. She took a complaint about a week and a half after this whole incident which tends to prove or disprove that this whole thing happened. It is relevant to the disclosure that we're saying she made, that Munford made. She took the complaint and had multiple discussions with the other nurses.

The court indicated its intent to sustain defendants' objection, but asked for clarification of the basis of Ziolkowski's claim that Barron's testimony was admissible:

THE COURT: So I can make sure I understand what your offer is, you're simply requesting to offer statements made by your own client—

[Plaintiff's counsel]: Yes.

THE COURT:—several weeks later, or a week or several days later, just indicating what her complaint is. Is that correct?

[Plaintiff's counsel]: And nurses commenting to her, e-mails and nurses [sic].

THE COURT: Wait a minute. What's the relevance of nurses commenting to her?

[Plaintiff's counsel]: She might say that some of these nurses are saying, "Yes, I knew about the disclosure," or "Yes, I was there. I heard this nurse saying—"

THE COURT: Is that your offer of proof? Is that what the evidence is?

[Plaintiff's counsel]: She's their witness, Judge. She's in their current employ.

THE COURT: She's your witness and it's your obligation to state the basis of admissibility of your witness' testimony.

[Plaintiff's counsel]: Okay.

THE COURT: This isn't discovery.

[Plaintiff's counsel]: She is going to say there were people in management who were talking to her about this disclosure and indicated how to handle the disclosure, who made the disclosure, which nurse made this alleged disclosure. I mean—

THE COURT: All hearsay. Nobody that was there at the time.

[Plaintiff's counsel]: These are admissions by a party opponent. These are statements against interest. These also go to notice. These go to punitive damages. It shows that the company knew about—

Ziolkowski thereafter made an offer of proof in which Barron testified under oath at some length during the jury's lunch break. During that offer of proof, Ziolkowski's counsel argued only that Barron's testimony concerning Heartland's investigation of Ziolkowski's complaints (or lack thereof) was relevant to Heartland's liability for punitive damages, and should be admissible in the first phase of trial. No mention was made of the potential relevance of this evidence to the underlying liability issues.

At oral argument in this Court, Ziolkowski made clear that she is not arguing that her own statements to Barron, recounting her version of the events of May 28–29, 2006, were admissible, abandoning one of the "liability-related" theories of admissibility she offered at trial.[3] Moreover, dur-

3. To the extent Ziolkowski contends that the *fact* of her prompt complaints (as opposed to the specific *content* of those complaints) corroborate her claims, we note that it was already in evidence, separately from Barron's proffered testimony, that Ziolkowski made complaints to other nurses shortly after the alleged disclosures, and that her mother con-

ing the offer of proof Barron did not relate that any nurse, or any management personnel, acknowledged to her that the disclosures had occurred, or related any other information as to what occurred on the night in question. Thus, the other liability-related admissibility theory Ziolkowski offered at trial—that Barron's testimony would recount admissions by the defendants, or statements against their interest—was not borne out by the offer of proof. The remaining theories of admissibility now offered by Ziolkowski on appeal—that a lax environment concerning patient confidentiality existed at Heartland, making Ziolkowski's allegations more plausible; and that Heartland's purported "cover-up" indicated its consciousness of guilt—were never broached with the circuit court during trial.[4]

 Ziolkowski was the proponent of Kimberly Barron's testimony. As the trial court accurately observed, it was Ziolkowski's obligation to identify the basis on which she contended that Barron's testimony should be admitted.

When an appellant challenges the exclusion of evidence, the appellant is limited to the reason he gave at the time he made the offer of evidence. It is the obligation of a party to bring to the attention of the trial court its position as to relevancy of evidence offered.... It cannot advance a theory of admissibility on appeal different from that advanced at trial. Rule 84.13(a) says, "[A]llegations of error not presented to or expressly decided by the trial court shall not be considered in any civil appeal from a jury trial case."

*Johnson v. Allstate Ins. Co.*, 262 S.W.3d 655, 668 (Mo.App. W.D.2008) (quoting *Marion v. Marcus*, 199 S.W.3d 887, 892 (Mo.App. W.D.2006)) (other citations and internal quotation marks omitted).[5] Because Ziolkowski did not argue to the trial court that Barron's testimony was relevant for the liability-related reasons she now argues on appeal, we cannot rely on those theories to justify reversal.

**B.**

 Ziolkowski also argues, as she did in the trial court, that Barron's testimony was relevant to punitive damages issues, and that the defendants' *liability* for punitive damages was an appropriate subject of evidence in the first phase of what was intended to be a bifurcated trial. Here, however, Ziolkowski faces a separate obstacle. The jury found in favor of Nurse Munford on Ziolkowski's underlying improper-disclosure claim, and therefore never reached the issue of whether the defendants' conduct justified an award of

tacted the Patient Advocate's office to register a complaint and make an appointment in the day or two following the incident.

4. Ziolkowski also suggests in her briefing that Barron's observation of Ziolkowski's depressed and upset emotional state when they met more than a week after the incident was relevant. She never argued this to the trial court, however. In addition, to the extent Ziolkowski intends to argue that Barron's observations would be relevant to the jury's assessment of compensatory damages, that claim cannot establish prejudicial, reversible error for the reasons discussed *infra* § I.B., because the jury never reached the question

on the verdict form asking it to assess Ziolkowski's compensatory damages.

5. This is the mirror image of the rule that, where an appellant challenges the *admission* of evidence, "[t]he scope of the objection [made at trial] may not be broadened or altered on appeal. Parties are prevented from advocating an objection to evidence on appeal that is different from the one presented to the trial court." *Lester E. Cox Med. Ctrs. v. Richards*, 252 S.W.3d 236, 239 (Mo.App. S.D. 2008) (citations omitted); *see also, e.g., Wheelhouse Marina Real Estate, L.L.C. v. Bommarito*, 284 S.W.3d 761, 767 (Mo.App. S.D.2009).

punitive damages. Even if we assume that Barron's testimony was admissible and relevant to punitive damages, and that the trial court erred in excluding it in the first phase of trial, Ziolkowski cannot establish prejudice resulting from this error.

> It is fundamental that a jury must award actual damages before it is authorized to award punitive damages. In the case at hand the jury returned a verdict in favor of [defendants]. Since the excluded evidence was admissible only on the issue of punitive damages, and the jury never awarded the prerequisite actual damages, it could not have considered punitive damages. When the jury's verdict demonstrates that it never reached the issue which is claimed to be the source of prejudice then no prejudice has been demonstrated.

*Linkogel v. Baker Protective Servs., Inc.*, 659 S.W.2d 300, 305 (Mo.App. E.D.1983) (citing, *inter alia, Beesley v. Howe*, 478 S.W.2d 649, 653 (Mo.1972)); *see also Oldaker v. Peters*, 817 S.W.2d 245, 254 (Mo. banc 1991); *Williams v. McCoy*, 854 S.W.2d 545, 558–59 (Mo.App. S.D.1993); *Jordan v. Abernathy*, 845 S.W.2d 86, 88 (Mo.App. E.D.1993).

■ "[I]n order to obtain a reversal based on the exclusion of evidence, an appellant must demonstrate the excluded evidence would have materially affected the merits of the cause of action." *Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 872 (Mo.App. E.D.2009). Ziolkowski cannot make the showing necessary to establish reversible error based on a claim that evidence was erroneously excluded, where that evidence relates to an issue that the jury never decided.[6]

Because Ziolkowski did not preserve her present claims that Barron's testimony was relevant to defendants' underlying liability, and because the relevance of Barron's testimony to punitive damages cannot establish prejudicial, reversible error, we deny Ziolkowski's first Point.

## II.

■ In her second Point, Ziolkowski challenges the trial court's admission of evidence concerning inconsistent statements she had made concerning the cause of the injury which led to her surgery and hospitalization on May 28, 2006.

On cross-examination, Ziolkowski testified, consistently with her deposition, that the injury which caused her hospitalization resulted from an accident, when she slipped on a toy her son had left on the floor, reached out to brace herself, and put her arm through a glass window. Ziolkowski testified that her boyfriend Jamel Fleming was approximately ten to twelve feet behind her when she fell. Moreover, she specifically denied that anyone pushed her through the window, or that she fell because she was wrestling with anyone. Over objection, defense counsel was allowed to cross-examine Ziolkowski concerning statements attributed to her in a medical record from approximately two and one-half months later. That medical record—which was itself later admitted into evidence and read to the jury—states:

> Date of service, 8/8/06. Boyfriend has put her arm through a glass window, which she states they were just goofing off; however, she severed the ulnar nerve and artery as well as some other muscular structures in the arm, leaving

6. Ironically, in responding to Heartland's alternative arguments Ziolkowski herself argues that issues concerning punitive damages are academic in light of the jury's verdict: "In the proceedings below, the jury did not return a punitive damage award, and the discussion of the legality of a separate damage award against Heartland, constitutional or otherwise, is simply hypothetical and would lead to an advisory opinion."

right hand with minimal function. The patient states this incident with the arm occurred approximately two months ago. Ziolkowski denied making the statement.

Ziolkowski argues that the cause of her injury was not an issue in the case, and that the prior inconsistent statement used to impeach her prejudiced the jury against her and her boyfriend, who also testified at trial. In *Mitchell v. Kardesch,* 313 S.W.3d 667 (Mo. banc 2010), the Missouri Supreme Court recently restated and clarified Missouri law concerning impeachment of witnesses on cross-examination. The Court identified the four most commonly used impeachment techniques: (1) "admission of evidence showing the witness's incapacity or problems in his or her ability to perceive or memory"; (2) "admission of evidence of prior convictions"; (3) "admission of prior inconsistent statements of the witness"; and (4) "admission of evidence of the witness's character for truthfulness and veracity." *Id.* at 675. The Court explained that cross-examination on each of these methods is generally permissible: "*Cross-examination* of a witness on the stand for the purpose of impeaching that witness through each of the methods just listed long has been permitted in Missouri, subject to the court's discretion in limiting or, in rare instances, precluding such evidence entirely so as to avoid undue prejudice." *Id.*

Specifically, the Court held that cross-examination exposing that a witness' trial testimony is inconsistent with prior statements is generally allowed to the extent it affects the witness' credibility.

> Missouri ... permits cross-examination where the witness's testimony at trial is inconsistent with a prior statement, but here the cases generally require the prior statement to be about a material issue. ... But the cases broadly define materiality to include statements affecting credibility. For example, *Kearbey v. Wichita Se. Kan.,* 240 S.W.3d 175, 187 (Mo.App.2007), held that admission of prior inconsistent statements about marijuana use made by defendant in response to various medical questionnaires was admissible, noting that "the jury could infer that a person who is not consistently truthful in statements made to other persons might also be untruthful in his testimony on the witness stand."

*Id.* at 676. The Court also held that specific instances of untruthfulness could be explored on cross-examination under the fourth principal impeachment category: "admission of evidence of the witness's character for truthfulness and veracity":

> When a person, regardless of whether a party, is being questioned on the witness stand, then long-standing Missouri law holds that the person may be asked about specific instances of his or her own conduct that speak to his or her own character for truth or veracity, even where the issue inquired about is not material to the substantive issues in the case.

*Id.* Based on these principles, *Mitchell* found that the trial court in that case had abused its discretion by refusing to permit the plaintiff in a medical negligence case to cross-examine the defendant physician about misstatements in interrogatory responses concerning the fact that his licenses to practice medicine in Missouri and New York had previously been suspended due to unrelated issues. *Id.* at 678–79.[7]

The *Kearbey* case, cited with approval in *Mitchell,* is also highly instructive. In

---

7. Separate from its discussion of the permissible scope of impeaching *cross-examination,* *Mitchell* also recognizes that trial courts retain considerable discretion concerning the admission of *extrinsic evidence* of prior inconsistent statements or instances of untruthful-

*Kearbey,* the jury determined that Plaintiff-driver Kearbey was 100% at fault in the motor vehicle collision at issue in the case. One of Kearbey's points on appeal was that the trial court erred in allowing him to be cross-examined about the prior inconsistent statements, found in his medical records, concerning whether he had previously used marijuana. Kearbey argued, as does Ziolkowski here, that the subject-matter of his prior inconsistent statements was more prejudicial than probative and was irrelevant. Rejecting those arguments, this Court stated:

> A witness may be compelled to answer any such question, however irrelevant it may be to the facts in issue, and however disgraceful the answer may be to himself, except where the answer might expose him to a criminal charge.... [T]he admissibility of specific acts tending to impeach or disparage the testimony of a witness is largely within the discretion of the trial court. In the discretion of the trial court, a witness may, for the purpose of impeachment, be asked whether he has committed particular wrongful ... acts, subject to his right to refuse to answer incriminating questions, even though such facts or acts may be collateral to the principal controversy.

*Kearbey,* 240 S.W.3d at 186–87 (citations and internal quotation marks omitted). Although there was no allegation that marijuana use by Kearbey played a role in the motor vehicle collision, this Court held that whether he had *lied* about marijuana usage to medical providers was relevant to his credibility:

> Clearly, the question of whether Kearbey made inconsistent representations in doctor's questionnaires is one that goes to his credibility as a witness.... [T]he

jury could infer that a person who is not consistently truthful in statements made to other persons might also be untruthful in his testimony on the witness stand. Assuming that inconsistent statements were made by Kearbey regarding his past use of marijuana, the two statements together are evidence of a prior bad act that tends to show a lack of veracity. This is so because admitting that two statements of this nature exist is essentially admitting to deceit in the production of one statement or the other. Such an attack is relevant to witness credibility and is within the permissible scope of cross-examination. The fact that marijuana use was the underlying topic of disclosure in the questionnaires and such use itself was irrelevant to the issues at trial is immaterial.

*Id.* at 187.

 The *Mitchell* and *Kearbey* cases dispose of Ziolkowski's principal contentions in her second Point: that the evidence of her inconsistent statements involved "an entirely collateral, immaterial issue," and that the trial court improperly found that her testimony on direct examination had "opened the door" to cross-examination on the cause of her injuries. As *Mitchell* and *Kearbey* make clear, because such inconsistencies raise legitimate questions as to a witness' credibility, cross-examination by confronting a witness with prior inconsistent statements is permissible even though those prior statements concern what might otherwise be a collateral issue. By the same token, given that such cross-examination is permissible despite the irrelevance of the subject of the inconsistent statements, it is unnecessary that the opposing party have "opened the door" to the specific subject matter in direct examination. Whether the issue

---

ness. *Id.* at 679–82. As we discuss *infra* note 8, however, Ziolkowski did not separately assert on appeal an objection to the admission

of extrinsic evidence of her prior inconsistent statement.

was broached on direct examination or not, "[a]s a general proposition, the credibility of witnesses is always a relevant issue in a lawsuit." *Mitchell*, 313 S.W.3d at 675 (citation and internal quotation marks omitted)

Ziolkowski's credibility was plainly a central issue at trial. The resolution of this lawsuit depended in large part on the jury's assessment of Ziolkowski's truthfulness in describing the substance of her conversations with Nurse Munford on the night of May 28–29, 2006, and on her description of the effect of Nurse Munford's disclosures on her, and on her relationships with family and friends. The prior inconsistent statement here concerned the events of May 28 which led to the hospitalization during which the allegedly improper disclosures occurred. Moreover, Ziolkowski has not suggested that the inconsistency between her statements concerning the cause of her injuries could have been explored in any less prejudicial manner. Even if the subject matter of the inconsistent-statement impeachment would otherwise be properly characterized as collateral, the trial court acted within its discretion in permitting that examination.

▌ In the argument under her second Point Relied On (but not in the Point itself), Ziolkowski also complains that there was no foundation for admission of the medical records which contained the purportedly inconsistent statements. At trial, and before this Court, Ziolkowski

argues that the parties stipulated to the foundation for Heartland's medical records only for the dates May 28–29, 2006, and that the stipulation did not extend to the August 8, 2006 record used for impeachment. Ziolkowski has not provided this Court, however, with any written stipulation or oral recitation of the parties' stipulation in the record that would permit us to determine the scope of the stipulation. The trial court specifically recited, prior to trial, that "[t]he parties stipulated to the authenticity of medical records and reserved any other specific objection as to admissibility." Later, when discussing the exhibit containing the quoted statement, the court again stated its belief that "foundation has already been stipulated to." Under the abuse of discretion standard, we are to presume the correctness of the trial court's rulings. We also recognize that such evidentiary stipulations are often expressed informally and off the record. Absent any basis in the record available to us on appeal to suggest that the trial court's understanding of the scope of the parties' stipulation was erroneous, we reject Ziolkowski's claim that foundation for the admission of the medical record used for impeachment was not established.[8]

### III.

Ziolkowski's final Point on appeal argues that the trial court erred in denying her a new trial because the cumulative effect of the erroneous evidentiary rulings deprived her of a fair trial. As we have found

---

8. To the extent Ziolkowski separately intended to argue that an inadequate foundation was laid for use of a prior inconsistent statement, we likewise reject that argument. Defense counsel asked Ziolkowski whether she had made the statement, and whether the statement was true, both of which Ziolkowski denied. Ziolkowski's own objections limited the scope of defense counsel's questioning, and prevented defense counsel, for example, from having Ziolkowski read the statement, or from reading it to her. This obviously

prevented defense counsel from asking Ziolkowski whether the statement refreshed her recollection, and from offering her the opportunity to explain it.

In a supplemental authority letter sent on June 24, 2010, Ziolkowski's counsel sought to rely on another aspect of the *Mitchell* decision: its discussion of the circumstances in which *extrinsic evidence* may be admitted to establish a prior inconsistent statement. However, other than arguing that no foundation was laid for the admission of the incon-

above, however, Ziolkowski failed to preserve her current claim that Kimberly Barron's testimony was relevant to underlying liability issues; the relevance of Barron's testimony to punitive damage issue cannot establish prejudice; and the trial court did not err in permitting cross-examination of Ziolkowski concerning the cause of the injuries which led to her May 28, 2006 hospitalization. We cannot find cumulative error sufficient to justify reversal for a new trial in these circumstances. *See Roberson v. Weston*, 255 S.W.3d 15, 19 (Mo.App. S.D.2008) (refusing to find cumulative error where individual claimed errors were not "brought to the trial court's attention by proper, timely objection during trial and, thus, were not individually preserved for appellate review"); *Koontz v. Ferber*, 870 S.W.2d 885, 894 (Mo.App. W.D.1993) ("[R]elief will not be granted for cumulative error when there is no showing that prejudice resulted from any rulings of the trial court.").[9]

### Conclusion

The judgment is affirmed.[10]

All concur.

---

sistent statement, Ziolkowski's briefing did not argue that the trial court erred by admitting the August 8, 2006 medical record itself, and specifically did not argue that admission of the record was erroneous because it constituted extrinsic evidence of a prior inconsistent statement. Instead, Ziolkowski's argument was focused on her contention that the entire subject matter of this cross-examination was improper.

9. In addition to arguing cumulative error based on the errors challenged in her first two Points Relied On, Ziolkowski also attempts to support her cumulative error point by referring to alleged misstatements of the law by defense counsel in opening statement, and purportedly improper testimony elicited by defense counsel concerning Ziolkowski's appearance on May 28–29, 2006, and her prior obesity. No contemporaneous objections were made at trial concerning these matters, however. Indeed, the purported impropriety of the questioning concerning Ziolkowski's appearance and weight was not even referenced in her new trial motion.

10. As noted, we need not address the defendants' alternative arguments. Because she is not the prevailing party given our affirmance, we deny Ziolkowski's motion for attorneys fees on appeal.