

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| JESSICA HUETT, | ) | No. ED110991 |
| | ) | |
| Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| v. | ) | Cause No. 20SL-CC03084 |
| | ) | |
| KENT BRANSON, M.D., et al, | ) | Honorable Dean P. Waldemer |
| | ) | |
| Respondents. | ) | Filed: July 18, 2023 |

## I. Introduction

Jessica Huett, the natural mother and Next Friend of J.H., appeals the judgment entered on the jury's verdict finding that Kent D. Branson, M.D., and K.D.B. Enterprises, Inc. (collectively "Defendants") were not liable for medical negligence in the delivery of Huett's son, J.H. On appeal, Huett contends that the circuit court erred in (1) permitting a biomechanical engineer to testify as an expert about the general and specific causes of J.H.'s injury and (2) limiting evidence of J.H.'s past medical damages. We agree that the circuit court erred in allowing the biomechanical engineer to testify to the specific cause of J.H.'s injury. For that reason, we reverse and remand for a new trial.

1

## II. Background

Dr. Branson treated Huett throughout her pregnancy with J.H. On April 9, 2019, Dr. Branson induced Huett's labor, and by late the next afternoon, Huett began pushing. After almost two hours of pushing without sufficient progress, Dr. Branson applied a vacuum extractor to J.H.'s skull to assist in getting the baby further down the birth canal. J.H.'s head was delivered, and then Dr. Branson put his hands on the baby's head to help get the body through. But J.H.'s right shoulder was stuck behind his mother's pubic bone. This is an emergency complication known as shoulder dystocia. The nurses put Huett into a different laboring position and applied pressure on Huett's abdomen just above her pubic bone in an attempt to dislodge the shoulder while Dr. Branson guided the baby's head. But J.H.'s body still did not deliver.

Dr. Branson then performed obstetric maneuvers to attempt to dislodge the shoulder. He tried to reach inside and deliver J.H.'s left arm to allow the right shoulder to dislodge. When that did not work, he tried rotating J.H.'s shoulders, which was also unsuccessful. Ultimately, Dr. Branson performed an episiotomy to create more room for another doctor to reach in and deliver J.H.'s left arm. J.H.'s body then followed.

In total, J.H. was stuck for at least five minutes. When he was finally delivered, J.H. was not breathing and had no heartbeat. After approximately thirteen minutes of resuscitation, J.H. was revived and taken to the neonatal intensive care unit. Although the existence and extent of other injuries were challenged at trial, there is no dispute that J.H. suffered injury to his right brachial plexus causing complete and permanent paralysis in his right arm. The brachial plexus is a group of nerves that governs movement and feeling in the arm. When those nerves are stretched excessively, they can rupture, causing permanent damage.

Huett then filed this medical malpractice lawsuit, claiming that Dr. Branson's management of her labor and delivery caused the shoulder dystocia and that the traction he used on J.H.'s head caused the brachial plexus injury. Defendants posited an alternative causation theory: that maternal forces were the primary cause of J.H.'s injury.

At trial, one of the major points of dispute was about the type and amount of traction that Dr. Branson applied to J.H.'s head. The testimony described two types of traction: axial and lateral. Axial traction is a downward movement keeping the baby's head aligned with the spine. Lateral traction is the bending of the head away from the shoulder. J.H.'s father, who was in the delivery room, testified that after J.H.'s head was delivered, he saw Dr. Branson "place both hands on [J.H.'s] head and make a rocking motion." Dr. Branson denied using lateral traction of any kind and testified that he did not yank, pull, or use excessive traction on J.H.'s head at any point.

There was also significant disagreement among the experts at trial about causation. Huett's medical experts—both physicians—testified that J.H.'s injury was caused by an inappropriate amount of lateral traction applied by Dr. Branson to J.H.'s head after it was delivered. They opined that a permanent injury to the brachial plexus like the one J.H. suffered cannot occur due to "maternal forces" alone. "Maternal forces" refers to uterine contractions and pushing by the mother. According to one of the plaintiff's experts, the amount of stretch necessary to cause this type of injury only occurs when the head is delivered, but the body is still inside, and the head is being pulled away from the stuck shoulder.

Defendants' alternative causation theory was presented primarily through the testimony of biomechanical engineer Dr. Michele Grimm. Dr. Grimm has a doctorate in bioengineering, which she described as a field that "uses traditional forms of engineering to understand how the body works, how it breaks, and what we can do then to assist it in diagnosis or treatment if it does break."

3

In the late 1990s, Dr. Grimm began collaborating with an obstetrician on research regarding the biomechanics of birth and their effects on newborns. Since that time, Dr. Grimm's research has focused on the topic of brachial plexus injury. She has published numerous peer-reviewed articles on this topic in the American Journal of Obstetrics and Gynecology and was part of a task force initiated by the American College of Obstetricians and Gynecologists to provide a critical analysis of the scope of literature on the topic.

Dr. Grimm does not have a medical degree and has never delivered a baby or observed the delivery of a baby in person (other than her own children). As a non-physician, she has never performed the shoulder dystocia maneuvers she has researched and written about. Dr. Grimm gained a general familiarity with human physiology during school, but has since learned more about labor and delivery and the biomechanics associated therewith through her discussions with clinicians and by way of self-study.

In the early 2000s, Dr. Grimm and her research group developed a computer model to study the mechanics of brachial plexus injury during a shoulder dystocia. The program was adapted from existing software originally designed to simulate car crashes and since used to study any force applied to the body. Dr. Grimm redesigned the software to simulate a shoulder dystocia scenario after a baby's head is delivered. Dr. Grimm's model assumed a baby in the ninetieth percentile for size and a mother of average size with a fiftieth percentile pelvis of gynecoid shape.[1]

The model also used information about neck stiffness and nerve stretch taken from animal studies. Dr. Grimm testified that it is not ethically possible to research how the nerves of live children react to force, nor would any parent consent to such a study. And, she explained, nerves

---

[1] Dr. Grimm testified that the pelvis is generally one of four shapes. According to Dr. Grimm approximately fifty percent of the population has a gynecoid pelvis with the other fifty percent having one of the other three shapes. Dr. Grimm's model assumed a gynecoid shape.

are generally hard to study post-mortem because they "turn to mush," and there are few infant cadavers available. As a result, information about neck stiffness came from a study of infant goats, which Dr. Grimm testified had been deemed a reasonable surrogate for the human infant neck by another study. Information about nerve stretch came from a study about how a rabbit's tibial nerve stretches, which Dr. Grimm testified was a surrogate for a human baby's brachial plexus.

Dr. Grimm then used the software to run simulations using different types of forces to see how they stretched the brachial plexus when it was impacted on the model mother's pubic bone. Dr. Grimm testified that there is "no way" to measure the actual amount of force occurring inside the uterus during a live birth. She testified that "normal amounts" of pressure from uterine contractions and maternal pushing would cause approximately fifty pounds of force to be exerted on the ninetieth percentile model infant. Dr. Grimm testified that she ran simulations using clinician-applied axial traction on the baby's head in the "normal range" (noting that axial traction is the type typically used during deliveries), lateral bending of the baby's neck by the clinician, and the obstetric maneuvers used during a shoulder dystocia.

Dr. Grimm testified that these computer simulations confirmed that when there is lateral bending of the neck, that causes the greatest amount of stretch on the brachial plexus and "cannot be eliminated as a likely cause of injury." On the other hand, without clinician-applied lateral traction, "the greatest amount of stretch actually occurs due to maternal forces when that shoulder gets stuck." She explained that during a shoulder dystocia, maternal forces continue to push on the baby from his bottom, but because the shoulder is impacted against the bone, only the head continues to move forward, widening the angle between the shoulder and the neck and stretching the brachial plexus. Dr. Grimm said her computer simulation predicted an eighteen percent stretch to the brachial plexus due just to the maternal forces, which she opined is sufficient to "cause a

5

permanent injury in a portion of the infant population." She explained that a study—which had admittedly not been validated by other research—showed that in about thirteen percent of the piglet population, the brachial plexus ruptured when it was stretched between eleven percent and twenty percent. Unlike lateral bending, Dr. Grimm testified, axial traction on the model infant in the computer program caused less stretch than the maternal forces. Moreover, Dr. Grimm's computer model suggested that obstetric maneuvers generally reduce any additional stretch to the brachial plexus.

Dr. Grimm testified that she does not ever modify the information about the model baby and mother in the computer program to reflect a particular mother's pelvis size or shape or a particular baby's size "because there's too much we wouldn't know[,]" including the specific amount of stiffness in the baby's neck or the properties of the baby's nerves. Dr. Grimm explained that she uses the computer simulation to understand the mechanics in general and then, when asked to provide an opinion regarding a specific case, she looks "at the facts of the case and how that relates to what we know in general, in order to form my opinion." In all cases where there is no evidence of lateral traction, Dr. Grimm's opinion is that the greatest amount of stretch to the brachial plexus was due to maternal forces.

As to this specific case, Dr. Grimm stated her opinion about the cause of J.H.'s injury as follows:

> Based on the facts of the case, based on the fact that there's no evidence that there was any bending of [J.H.'s] neck during the delivery, it's my opinion that the injury occurred due primarily to maternal forces, as maternal forces delivered his head, and the shoulder dystocia occurred, stretching the brachial plexus. Then potentially with a smaller contribution from the normal gentle traction, axial traction, that Dr. Branson applied to assist with the delivery[.]

Dr. Grimm testified that there was nothing in the medical records or depositions she reviewed indicating that Dr. Branson applied lateral traction to J.H.'s head during this delivery.

6

Dr. Grimm also opined that J.H. fell into a portion of the infant population that has a "greater susceptibility to injury" to the brachial plexus from maternal forces: "The fact that he sustained an injury is an indication that he was more susceptible to injury than a majority of the population." Dr. Grimm opined that, based on the piglet nerve study, J.H. had a "fifteen percent condition of lower susceptibility of his nerve roots to failure." She disclaimed that this was not a pathological diagnosable condition, rather these are "normal variations" in human nerves just like the variations in human heights.

Dr. Grimm did not know whether Huett's pelvis was gynecoid like the model mother's or one of the other possible pelvis shapes. She also did not measure "any of the specific forces involved in [J.H.'s] delivery." Dr. Grimm said it is "not possible to deduce exactly what the force is on the nerve." Nor is it possible to measure the maternal forces that occurred during a delivery after the fact. But, Dr. Grimm said, based on "normal amounts of intrauterine pressure" there was "probably about fifty pounds of force[.]" There was nothing in the record indicating to Dr. Grimm that Huett was not producing "normal amounts" of pressure. But Dr. Grimm agreed that she did not actually know how strong Huett's contractions were.

Similarly, Dr. Grimm said that "no one is able to make [an] assessment" of how much traction or force Dr. Branson applied to J.H.'s head. Her causation opinion was based on her understanding that in his deposition, Dr. Branson said he used only "gentle axial traction." Dr. Grimm testified that she defines "gentle traction" as that which is normally applied in any other delivery. But she agreed that she was only assuming that is how Dr. Branson would define the term and that she did not know what amount of force Dr. Branson normally applies during delivery.

Two other defense experts—both obstetrician/gynecologists—agreed that there is a causal link between maternal forces and brachial plexus injury. One of those experts was asked if he had

7

an opinion about the cause of this brachial plexus injury, but his answer contained only generalizations about the "multiple factors" that go into the injury, one of which is the maternal forces that "starts the process." The other expert did not offer any opinion about the specific cause of J.H.'s injury.

Before trial, the circuit court granted Defendants' motion to limit evidence of J.H.'s past medical damages to the "actual cost of the medical care or treatment" as that term is defined by § 490.715.5(2) RSMo Supp (2017) and to preclude Huett from presenting evidence of the total amount that had been billed for J.H.'s medical treatment. At the close of the plaintiff's case, the parties stipulated to the amount that had been paid to J.H.'s medical providers for his medical treatment and to the amount still owed to his medical providers. Huett did not attempt to present evidence of the total amount that had been billed. But the jury never reached the matter of damages because it returned a verdict in favor of Defendants, finding no liability.

The circuit court denied Huett's motion for new trial, and this appeal follows.

### III. Discussion

On appeal, Huett contends that the circuit court erred in permitting Dr. Grimm to testify as an expert about the cause of this injury generally and the cause of J.H.'s injury specifically and in limiting the evidence of J.H.'s past medical damages to the amount paid and owed.

### *Expert Testimony*

In her first point on appeal, Huett contends that the circuit court erred by permitting Dr. Grimm to testify as an expert. Expert testimony in civil cases is only admissible if it satisfies the evidentiary requirements of § 490.065.[2] *Linton by & through Linton v. Carter*, 634 S.W.3d 623, 626 (Mo. banc 2021). To the extent we are required to interpret that statute, we do so *de novo*. *Kirk*

---

[2] All statutory references are to RSMo Supp (2018), unless otherwise noted.

*v. State*, 520 S.W.3d 443, 460 (Mo. banc 2017) (citing *Kivland v. Columbia Orthopaedic Group, LLP*, 331 S.W.3d 299, 311 (Mo. banc 2011)). But this Court reviews the application of that statute to the facts of a particular case, like all other questions concerning the admissibility of evidence at trial, for an abuse of discretion. *Kirk,* 520 S.W.3d at 460.

> In relevant part, § 490.065 provides:
>
> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) The testimony is based on sufficient facts or data;
> (c) The testimony is the product of reliable principles and methods; and
> (d) The expert has reliably applied the principles and methods to the facts of the case[.]

§ 490.065.2(1). This Court has held that the "admissibility of expert testimony under [§] 490.065.2 requires simply that it be relevant and reliable and proffered by a qualified expert." *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 319 (Mo. App. E.D. 2018).

Huett does not challenge the relevance of Dr. Grimm's testimony, only her qualifications and the reliability of her testimony. An expert may be qualified on a particular topic by her "knowledge, skill, experience, training, or education." § 490.065.2(1). "Reliability is determined by considering whether the testimony is based on sufficient facts or data, reliable principles and methods and reliable application thereof." *Wright,* 562 S.W.3d at 319 (citing § 490.065.2(1)(b)-(d)).

Dr. Grimm gave opinions both on the general cause of brachial plexus injuries during childbirth and on the specific cause of J.H.'s injury.[3] First, she testified generally that, based on

---

[3] "Specific causation" and "general causation" are terms that have largely developed in toxic tort cases. *See Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 683-84 & 711 n.24 (Mo. App. E.D. 2020). General causation refers to whether an injury can be caused by a certain process; i.e. whether maternal forces alone can ever cause a brachial plexus injury.

her computer simulation, maternal forces alone are sufficient to cause permanent brachial plexus injury in a portion of the infant population. Then, she testified specifically that J.H. was within that portion of susceptible infants and that his permanent brachial plexus injury was caused primarily by maternal forces with some contribution from the gentle axial traction applied by Dr. Branson. We address her qualifications to give each of these opinions, and the reliability thereof, in turn.

*General Causation Opinion*

Huett contends that the circuit court erred in allowing Dr. Grimm to opine that maternal forces alone can cause permanent injury to the brachial plexus during a shoulder dystocia in a certain portion of the infant population. Her arguments regarding Dr. Grimm's general causation opinion are not properly preserved, but because the issue is likely to recur on remand for a new trial, we review them *ex gratia*.[4]

*Qualifications*

Huett's challenge to Dr. Grimm's qualifications is largely based on the assertion that as a biomechanical engineer Dr. Grimm was not qualified to give either general or specific medical causation opinions because such medical opinions should be rendered by a qualified medical professional. We need not decide whether such a blanket rule exists, however, because Dr. Grimm's general causation opinion was limited to the effect of maternal forces on an infant's body during shoulder dystocia and the ability of those forces to cause injury to the brachial plexus. This was well within Dr. Grimm's expertise as a biomechanical engineer, in particular the knowledge and education she gained researching and studying this precise issue for over two decades.

---

Specific causation refers to whether the particular plaintiff's injury was caused by that process; i.e. whether maternal forces alone caused J.H.'s injury.

[4] Huett objected to the entirety of Dr. Grimm's opinions in a pre-trial motion. However, at trial, no objection was made to Dr. Grimm's testimony regarding general causation. Counsel did not object to the testimony until Dr. Grimm began to testify regarding specific causation.

Moreover, the Supreme Court of Missouri has determined that biomechanical engineers may be qualified to testify about the effects of forces on a body. For example, in *Moore v. Ford Motor Company*, the Court concluded that a biomechanical engineer was qualified to testify about the "effect of forces acting on a person's body in an accident" and "the forces that would create a T9-T10 dislocation in the area of the body where [the plaintiff] sustained her injuries." 332 S.W.3d 749, 759 (Mo. banc 2011). The same is true under the federal rules: "biomechanical engineers typically are found to be qualified to render an opinion as to the forces generated in a particular accident and the general types of injuries those forces may generate." *Norman v. Textron Inc.*, 2017 WL 9360844, at *4 (W.D. Mo. Nov. 6, 2017) (applying Federal Rule of Evidence 702).[5]

Dr. Grimm's general causation opinion testimony was based on her extensive study and modeling of the forces involved in shoulder dystocia. Based on that study, Dr. Grimm concluded that maternal forces alone are sufficient to cause a brachial plexus injury during shoulder dystocia. As a biomechanical engineer, Dr. Grimm was qualified by her "knowledge, skill, experience, training, or education" to give this opinion. *See* § 490.065.2(1).

*Reliability*

Dr. Grimm's general causation opinion was also based on sufficiently reliable principles and methods. Huett's primary complaint is that Dr. Grimm used a computer program initially designed to model car crashes and used inputs from animal studies about the stiffness of goat necks and the strength of rabbit nerves. But, as Dr. Grimm explained, she and her team could not practically or ethically study the effect of forces on human babies directly, and that is why they developed a computer simulation. The existing car crash simulation software was widely used

---

[5] "Section 490.065.2 adopts the Federal Rules of Evidence word-for-word, and therefore federal precedent construing those rules is strong persuasive authority for how we should view admissibility under our statute." *Wright*, 562 S.W.3d at 317.

and—as Huett herself points out in her brief—recognized as a valid method for analyzing forces on a body in a car accident. Dr. Grimm adapted that software to simulate the effect of maternal forces on the brachial plexus during shoulder dystocia. Moreover, Dr. Grimm explained that the use of information about animals as surrogates for human infant properties is a valid practice in scientific research, citing a Medical College of Wisconsin study that used the properties of a goat's neck to study the effect of airbags on infants and a Duke University study of human cadavers that concluded infant goat necks are a reasonable substitute for infant human necks. Any inconsistencies or inaccuracies in this practice goes to the weight of Dr. Grimm's opinion, but does not render the opinion so unreliable as to justify its exclusion, particularly when other experts in Dr. Grimm's field use the same methods in their scientific studies.

Huett also claims that Dr. Grimm's computer program calculates the stretch to the brachial plexus by increasing the maternal forces *until the impacted shoulder is delivered* by those forces alone. She contends that this is an unreliable method for analyzing real-world shoulder dystocia settings, in which the mother is told to stop pushing and then obstetrics maneuvers are employed to dislodge the shoulder. But Dr. Grimm's testimony does not appear to indicate that her program simulates what happens if maternal forces alone just keep pushing until the shoulder is delivered. Rather, Dr. Grimm explained that the computer program calculates the stretch on the brachial plexus by simulating the maternal forces that continue pushing the baby downward at the time the shoulder becomes impacted against the pubic bone.

The circuit court did not err in admitting Dr. Grimm's testimony that, as a matter of general causation, maternal forces are capable of causing a brachial plexus injury of the type suffered by J.H.

12

*Specific Causation Opinion*

Dr. Grimm's testimony regarding the specific cause of J.H.'s injury, on the other hand, should have been excluded. Dr. Grimm opined that J.H. was within the portion of infants susceptible to permanent brachial plexus injury and that his injury was caused primarily by maternal forces with some contribution from the gentle axial traction applied by Dr. Branson. Dr. Grimm was not qualified to give this opinion and did not reliably apply her computer modeling to the specific facts of this case.

*Qualifications*

Unlike her general causation testimony, Dr. Grimm's opinions that J.H. was susceptible to brachial plexus injury and that Dr. Branson applied "gentle" traction to J.H.'s head are not simply opinions regarding how the human body reacts to certain types of forces. We need not decide whether, as a biomechanical engineer, Dr. Grimm was categorically unqualified to give these opinions. Rather, regardless of her title or licensure or the characterization of the opinions as "medical," Dr. Grimm did not have the "knowledge, skill, experience, training, or education" to opine on either of these matters. *See* § 490.065.2(1).

Dr. Grimm's biomechanical engineering education, training, and self-taught knowledge about the brachial plexus did not include identifying which infants have the type of tissue variations that make them more susceptible to brachial plexus injury. Regardless of whether it constitutes a diagnosis of a pathological condition, Dr. Grimm was not qualified to opine that J.H. fell into that portion of the population that is more susceptible to brachial plexus injury. Particularly where the only basis for her opinion appears to be that J.H. must have been more susceptible to injury because he sustained an injury.

Similarly, Dr. Grimm was not sufficiently qualified to testify regarding the "standard traction" used during deliveries. Dr. Grimm testified that her familiarity with axial traction and understanding that it is the typical type of traction used during deliveries was based on discussions with the obstetrician she collaborated with in her research who was "having us model typical scenarios in deliveries." She testified to no other knowledge, skill, experience, training, or education that would qualify her to give what amounts to an opinion that Dr. Branson's conduct was within the standard of care. Being told by a colleague that an obstetrics maneuver is typical did not give Dr. Grimm the requisite degree of expertise needed to qualify her to give this opinion. As a result, Dr. Grimm's specific causation testimony does not meet the requirements of § 490.065.2(1) that the witness be "qualified as an expert by knowledge, skill, experience, training, or education."

*Reliability*

Dr. Grimm's specific causation opinion was also inadmissible because it was not based on sufficient facts and data about this particular delivery and because she did not reliably apply her computer program to the particular facts of this case as required by § 490.065.

First, the specific causation testimony discussed above was not only outside Dr. Grimm's qualifications, but also was based on insufficient facts and unreliable methods. Her opinion that J.H. was more susceptible to brachial plexus injury was based solely on the fact that he incurred that injury. This circular reasoning is not only an insufficient factual basis for Dr. Grimm's conclusion about J.H.'s susceptibility, it is not a reliable method for reaching this conclusion. It does not appear to have utilized any method at all in violation of § 490.065.2(1)(c).

Additionally, Dr. Grimm's conclusion that J.H.'s injury was due primarily to maternal forces is based on speculation and conjecture and lacks any application of her modeling to the facts

14

of this case as required by § 490.065.2(1)(d). Dr. Grimm did not know the size or shape of Huett's pelvis or the amount of maternal forces involved in this delivery. In fact, she testified that it is not possible to measure the maternal forces that were exerted during J.H.'s delivery at this point. Although she guessed that there were probably fifty pounds of maternal forces involved here, that testimony was not based on any measurement or input from J.H. or Huett, and Dr. Grimm admitted there was no way for her to know if Huett's contractions and pushing were producing "normal amounts" of pressure during this delivery. A guess about the amount of the forces involved here does not provide a sufficient basis for opining that those forces caused the injury.

Although Dr. Grimm's computer program appears to be a reliable method on which to base her *general* causation opinion about the stretch that occurred to the brachial plexus, that opinion cannot reliably be applied beyond the scenario of that program: a ninetieth percentile model baby delivered by a model mother with an average-sized, gynecoid-shaped pelvis, during a delivery involving "normal amounts" of maternal forces and "normal amounts" of clinician-applied force. Without any facts about this mother and this baby and this delivery, Dr. Grimm could only speculate that the situation here was comparable to the one in her computer simulation. Dr. Grimm herself acknowledged that she does not apply the computer model on a case-by-case basis because "there would still be too many things we would have to guess at." Therefore, her computer simulation program was not a reliable method for analyzing this specific case and was not reliably applied to the facts of this case as required by § 490.065.2(1)(c)-(d).

Respondents argue that any variation between this particular case and the computer simulation should go to the weight of Dr. Grimm's opinion. But the complete lack of information regarding the key elements of the situation results in an opinion that is substantially the product of assumptions and conjecture. Dr. Grimm had no rational basis for concluding that the same outcome

15

produced in her computer simulation also occurred here. An expert witness's opinion must have a "rational basis" and be founded on substantial information, not "mere conjecture or speculation." *Revis v. Bassman*, 604 S.W.3d 644, 655 (Mo. App. E.D. 2020); *see also Rigali v. Kensington Place Homeowners' Association,* 103 S.W.3d 839, 845 (Mo. App. E.D. 2003).

The circuit court abused its discretion in permitting her to opine that maternal forces were the primary cause of J.H.'s injury.

*Prejudice*

This Court will not reverse a judgment unless the circuit court's error "materially affected the merits of the action." *Linton*, 634 S.W.3d at 627 (internal quotation marks and citation omitted). Dr. Grimm's testimony was the only evidence that J.H.'s specific injury was caused primarily by maternal forces. Although two other defense experts discussed the general theory that maternal forces can lead to a brachial plexus injury, neither of them testified that maternal forces were the specific cause of J.H.'s injury. Therefore, the error in permitting her to give specific causation testimony materially affected the outcome of this case. As such, that error was prejudicial and warrants reversal.

To the extent Huett claims it was error to admit the specific causation opinion of Dr. Grimm, Point I is granted.

### *Medical Damages Evidence*

In her second point on appeal, Huett contends the circuit court erred by limiting evidence of J.H.'s past medical damages to the "actual cost of the medical care or treatment" as that term is defined by § 490.715.5(2)—essentially, the amounts paid and owing for medical care or treatment—and barring her from submitting evidence of the total amount billed by healthcare

providers. She contends that such evidence is admissible pursuant to case law interpreting the statute.

The only "ruling or action" challenged in this point refers to a pretrial order in which the circuit court granted the Defendants' motion in limine. *See* Rule 84.04(d)(1)(A) (2023) (requiring each point to identify the "ruling or action" being challenged). "A pretrial ruling on a motion in limine is interlocutory in nature and is not an appealable order." *Jordan v. Abernathy*, 845 S.W.2d 86, 88 (Mo. App. E.D. 1993). We will not assign error to a court's in limine ruling excluding evidence. *See id*.; *see also Wilkerson v. Prelutsky*, 943 S.W.2d 643, 647 (Mo. banc 1997). Rather, the error should be directed to "the subsequent exclusion of the evidence at trial." *Wilkerson*, 943 S.W.2d at 647.

Here, there was no subsequent ruling excluding the evidence because Huett never attempted to present it at trial or make an offer of proof, steps that she admits are normally required to preserve this issue. *See Payne v. Fiesta Corporation*, 543 S.W.3d 109, 122 (Mo. App. E.D. 2018). These actions would have alerted the circuit court to Huett's continued challenge to excluding the evidence and given it an opportunity to change its pretrial ruling. But instead, Huett proceeded in a way that indicated her acquiescence to the circuit court's pretrial ruling. Huett's counsel told the circuit court at a sidebar during the trial that "based on [its] ruling," the parties were working toward a stipulation regarding the amounts paid and the amounts owed on past medical bills. Huett states on appeal that because of the pretrial ruling, she was "restricted" from including the total amount billed in the stipulation. It is unclear, however, how this precluded Huett from renewing her objection and submitting an offer of proof.

In any event, we decline Huett's request to review the issue because having found no liability, the jury never reached the issue of damages. Because the challenged evidence "relates to

an issue that the jury never decided[,]" Huett cannot establish the prejudice necessary to demonstrate reversible error. *Ziolkowski v. Heartland Regional Medical Center,* 317 S.W.3d 212, 220 (Mo. App. W.D. 2010). Unless and until a jury finds Defendants liable and determines the issue of damages, there can be no prejudice to Huett under any standard of review from any erroneous rulings, interlocutory or otherwise, regarding the exclusion of damages evidence.[6]

Point II is denied as moot.

## IV. Conclusion

The judgment is reversed, and the case is remanded for a new trial consistent with this opinion.

John P. Torbitzky, J.

Gary M. Gaertner, Jr., P.J., and
Cristian M. Stevens, J., concur.

---

[6] Our decision not to reach this issue is consistent with our decision to reach the issue of general causation despite the lack of preservation because the jury necessarily reached the issue of negligence and decided it against Appellants. The same is not true of the issue of damages.