**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 14-4710 and 14-4728
_____

UNITED STATES OF AMERICA

v.

ROBERT KESZEY,
                    Appellant No. 14-4710

ROBROY MACINNES,
                    Appellant No. 14-4728
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-12-cr-00623-002 & 003)
District Judge: Juan R. Sanchez

Submitted Under Third Circuit LAR 34.1(a)
December 10, 2015

BEFORE: FUENTES, CHAGARES, and GREENBERG *Circuit Judges*

(Filed March 3, 2016)
_____

OPINION[*]
_____

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

FUENTES, *Circuit Judge*:

Defendants Robroy MacInnes and Robert Keszey were each convicted of conspiring to traffic in illegally obtained animals in violation of state and federal law. MacInnes was also convicted individually of trafficking in illegally obtained animals in violation of the Lacey Act. Defendants appeal the District Court's order denying their motions for a new trial. For the reasons that follow, we will affirm their convictions.

## I.

Most snakes are content to stay in the wild, free from the bothers of human activity. Others, by no fault of their own, are illegally taken from their homes and forced to travel all over the world. This is a case about the latter group. [1] Defendants Robroy MacInnes and Robert Keszey co-owned Glades Herp Farm ("Glades") in Bushnell, Florida. Glades collected, bred, traded, and sold various types of snakes globally. Loren Zuck worked for Glades, staffing the company's table at the Northern Berks Reptile Show in Hamburg, Pennsylvania, where he would acquire and sell snakes on Glades behalf.

In July 2008, two individuals from New York and regular customers of the Glades stand in Hamburg, Darren Paolini and Justin Munsterman, collected two adult, pregnant Eastern Timber Rattlesnakes from the wild in New York without a permit. Eastern Timber Rattlesnakes are a threatened species in New York and Pennsylvania, and therefore it is illegal in each state to take, transport, possess or sell the snakes without a

---

[1] The District Court had jurisdiction over this case under 18 U.S.C. § 3231. We have appellate jurisdiction under 28 U.S.C. § 1291.

proper permit. Under federal law, the Lacey Act also criminalizes purchasing, selling, or transporting animals obtained in violation of state law.[2] Paolini and Munsterman approached Zuck about purchasing some of the snakes. Zuck, in turn, called MacInnes and Keszey to ask if they were interested in the offer. They said that they were interested but wanted to wait until the snakes produced offspring. After the two snakes gave birth to 23 baby snakes, the parties arranged a deal whereby Glades would give Paolini and Munsterman store credit at Glades in exchange for the baby snakes. Zuck, on behalf of Glades, arranged to obtain the snakes from Paolini and Munsterman at a fireworks stand in Pennsylvania. After the exchange, Zuck mailed the snakes from Philadelphia to Glades in Tampa, Florida, keeping two of them to raise in Pennsylvania.[3]

Munsterman also sold two of the baby snakes to Lt. Richard Thomas, an undercover agent from the New York Department of Environmental Conservation ("NY

---

[2] The Lacey Act is codified at 16 U.S.C. §§ 3371-3378. Under 16 U.S.C. § 3372(a)(2)(A), it is a federal crime "to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce . . . any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law." 16 U.S.C. § 3373(d)(1)(b) further provides a criminal penalty for any person who "violates any provision of this chapter . . . by knowingly engaging in conduct that involves the sale or purchase of, the offer of sale or purchase of, or the intent to sell or purchase, fish or wildlife or plants with a market value in excess of $350."

MacInnes and Keszey were indicted under 18 U.S.C. § 371, which provides: "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both."

[3] Approximately two weeks later, Keszey shipped 20 timber rattlesnakes to an associate in Germany because, as Zuck testified, timber rattlesnakes are more valuable in Europe than in the United States.

DEC"). During their negotiation, Munsterman told Lt. Thomas that he intended to sell the additional timber rattlesnakes to Glades. This caught Thomas's attention and prompted the authorities to monitor Glades's website. Soon after the sale to Thomas, NY DEC investigators and Special Agent Randy Cottrell of the U.S. Fish and Wildlife Service observed that the inventory of timber rattlesnakes on Glades's website had changed.

As it turned out, Eastern Timber Rattlesnakes were not the only species of interest to Zuck. He also obtained two Eastern Indigo snakes from Glades. The Eastern Indigo is a threatened species under Florida and federal law, and, consequently, it is also illegal to buy or sell them without a permit, which Zuck, MacInnes, and Keszey did not have. Nonetheless, the parties agreed that Zuck would breed the snakes in Pennsylvania, sell the offspring at the Hamburg show, and split any profits among the parties.[4]

Based on an investigation into these events, authorities executed search warrants on the homes of Paolini and Munsterman, finding, among other things, various documents memorializing the birth of the baby timber rattlesnakes. Paolini agreed to cooperate with the authorities in connection with the investigation of MacInnes and Keszey. The authorities also began investigating Zuck based on information provided by Paolini and Munsterman. Zuck also eventually cooperated, agreeing to take part in recorded phone conversations with MacInnes and Keszey. During the recorded calls,

---

[4] Testimony also revealed other instances in which Defendants unlawfully collected reptiles, including one instance in Jim Thorpe, Pennsylvania, where Defendants collected two Eastern Timber Rattlesnakes in August 2006.

4

MacInnes encouraged Zuck to remain silent and to kill or sell the illegally obtained snakes. During another recorded call, NY DEC Investigator Dan Sullivan told Zuck that he was the target of state investigation into the illegal sale of timber rattlesnakes. Sullivan also explained that he had evidence implicating Zuck in the illegal purchase of Paolini and Munsterman's timber rattlesnakes.

MacInnes and Keszey were eventually charged with conspiracy to traffic in illegal animals, including the Eastern Timber Rattlesnakes and Eastern Indigo snakes.[5] MacInnes was also charged with purchasing protected timber rattlesnakes, knowing that they had been illegally obtained in New York in violation of the Lacey Act.[6] During their trial, the court made a number of evidentiary rulings, which Defendants now contest. The defense's theory was that MacInnes and Keszey had many legal sources for purchasing timber rattlesnakes and, consequently, they did not need to purchase unlawfully obtained snakes. To support this theory, Defendants relied on cross-examination of the government's witnesses but also attempted to call one witness, Terry Wilkins, to offer expert testimony regarding timber rattlesnakes. The District Court barred Wilkins' testimony, finding that he was not qualified as an expert witness and that he could not testify on any of the expert topics as a lay witness. The court also rejected Defendants' attempt to introduce a phone conversation between Zuck and Sullivan on

___

[5] While less pertinent to our discussion of the violations of state and federal law at issue on appeal, we note that Defendants were also charged with conspiring to traffic King Snakes.

[6] Glades was originally a defendant charged under both counts but was eventually severed from the case before trial.

cross-examination of the government's witnesses. In addition, the court also limited the scope of cross-examination as to the subject matter of Zuck and Sullivan's recorded conversation.

Following a jury verdict finding Defendants guilty, Defendants each moved for a new trial. The District Court denied the motions. This appeal follows.

**II.**

Defendants argue that the District Court erred on various evidentiary grounds when it denied their motions for a new trial. We review a district court's evidentiary rulings principally on an abuse of discretion standard.[7]

Defendants first argue that the District Court erred by excluding the recorded phone call between Investigator Sullivan and Zuck, which Defendants sought to introduce during Zuck's cross-examination to prove his motive to lie. The court found that the conversation was inadmissible under Fed. R. Evid. 803(3), 608(b), and 403. Because Zuck said little, if anything, of value, we agree that the probative value of the conversation was substantially outweighed by the danger of unfair prejudice. In addition, the evidence would have wasted time, delayed trial, and confused the issues before the jury.[8] The District Court therefore properly excluded the conversation.

---

[7] An abuse of discretion occurs only where the district court's decision is "arbitrary, fanciful, or clearly unreasonable" – in short, where "no reasonable person would adopt the district court's view." *United States v. Starnes*, 583 F.3d 196, 214 (3d Cir. 2009); *Complaint of Consolidation Coal Co.,* 123 F.3d 126, 131 (3d Cir. 1997)

[8] Fed. R. Evid. 403.

Defendants also claim that the District Court violated their right to confrontation by limiting the scope of their cross-examination of Zuck regarding the same conversation with Sullivan. To find that a limitation imposed by the District Court constitutes a violation of the Confrontation Clause, we must determine "(1) whether the limitation significantly limited the defendant's right to inquire into a witness's motivation for testifying; and (2) whether the constraints imposed fell within the reasonable limits that a district court has the authority to impose."[9] We note that both Defendants were given an adequate opportunity to cross-examine Zuck, but only Keszey did so. Moreover, Keszey's cross-examination of Zuck, in fact, covered a majority of the topics discussed during the call, including questions that revealed the genuine possibility that Zuck had a motive to lie in order to deflect the focus of the investigation. We therefore conclude that Defendants' ability to inquire into Zuck's motivation for testifying was not impaired and that any limitation imposed fell within the broad scope of discretion afforded to district courts when narrowing the scope of cross-examination to avoid cumulative, repetitive, or otherwise marginally relevant evidence.[10]

Defendants next argue that the District Court violated their Confrontation Clause rights by barring them from showing, on cross-examination, that timber rattlesnakes (1)

---

[9] *United States v. Harris*, 471 F.3d 507, 513 (3d Cir. 2006).

[10] *Douglas v. Owens*, 50 F.3d 1226, 1230 (3d Cir. 1995) ("'[t]rial judges retain wide latitude to impose reasonable limits on cross-examination based on concerns about, among other things, confusion of the issues or interrogation that is repetitive or only marginally relevant.'") (quoting *United States v. Baptista–Rodriguez*, 17 F.3d 1354, 1370–71 (11th Cir. 1994)).

7

are found in 31 states, (2) are unprotected in some of those states, and (3) give birth in late summer and early fall. Because none of the subjects were raised by the government during its direct testimony, we discern no error in the court's ruling.[11]

Finally, Defendants argue that the District Court erred by excluding expert and lay testimony by Terry Wilkins.[12] The record clearly reveals that Wilkins was not qualified to testify on Defendants' proposed topics as an expert witness. He had little, if any, training in herpetology and minimal academic exposure to the subject. And, because the proposed topics would have required expert testimony, the court also properly found that Wilkins could not testify on those topics as a lay witness.[13]

**III.**

For substantially the same reasons set forth in the District Court's thorough and persuasive opinion, we will affirm the judgments of the District Court.[14]

---

[11] Fed. R. Evid. 611(b).

[12] To establish that a witness is qualified as an expert, we require a three-part showing under Rule 702: (1) the proffered witness must be an expert, i.e., must be qualified; (2) the expert must testify about matters requiring scientific, technical or specialized knowledge; and (3) the expert's testimony must assist the trier of fact.

[13] Fed. R. Evid. 701 provides, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

[14] Because we conclude that the District Court committed no error in denying Defendants' motions for a new trial, we need not reach Defendants' argument that the cumulative effect of the District Court's evidentiary rulings violated Defendants' rights under the Confrontation Clause.