Robert G. Dowd, Jr., Presiding Judge
Kimberly Gardner seeks, on behalf of the State, a writ of prohibition against the Honorable Clinton R. Wright to prevent him from enforcing his order excluding certain expert testimony in a child sex case. We entered a preliminary order of prohibition, and a timely answer and suggestions in opposition were filed. We dispense with further briefing as permitted by Rule 84.24(j). We now make that preliminary order permanent.
Introduction
This case involves the application of recently-enacted new standards for the admissibility of expert testimony in a criminal case set forth in Section 490.065.2, which adopts verbatim the Federal Rules of Evidence. As a result, when applying that statute, we are guided by existing and still applicable Missouri law and the federal jurisprudence on this matter, including the seminal case of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) and its progeny. At its core, the gatekeeping function of a trial court with respect to expert testimony is essentially to determine that the expert is qualified, the testimony is relevant and the opinions therein are reliable. We review and discuss how the standards for admissibility in Missouri and federal courts have developed over time, but this case actually turns on an element of the trial court's inquiry into admissibility that has not changed: relevance. Because expert testimony regarding the process by which children disclose allegations of sexual abuse is relevant in child sex cases, the trial court erred in finding that it would not assist the jury in this case.
Background
Elliot Williams ("Defendant") was indicted on multiple charges of statutory rape in the first degree and statutory sodomy in the first degree stemming from sexual misconduct with D.M., who was eight years old at the time. D.M. did not disclose this abuse until six or seven years after it occurred, when she was fifteen. The State endorsed Audrey Leonard as an expert witness who would testify about the general behavior of children disclosing sexual abuse. Defendant filed a request for a Daubert hearing and a motion to exclude testimony regarding the steps of disclosure. Defendant argued that Leonard's testimony was inadmissible under the recently-adopted standards for expert witnesses set out in Section 490.065.2 and under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).
The court held an evidentiary hearing at which Leonard testified as follows. Leonard is a social worker. She has a bachelor's degree and a master's degree in social work. She has worked, and still does as needed, as a social worker in a children's *313 hospital; she was also a child abuse and neglect investigator for the Children's Division and a victim advocate at the Children's Advocacy Center ("CAC"). She is currently a forensic interviewer at CAC and had been in that position for three years at the time of the hearing. A forensic interviewer, Leonard testified, is a trained professional who conducts structured conversations with children alleged to be victims of or witnesses to crimes. To become a forensic interviewer, Leonard was required to undergo training in Child First interviewing, a nationally-recognized research-based protocol for interviewing children. She has participated in, and continues to undergo, other training related to forensic interviewing, child maltreatment and other topics. Leonard testified that she has conducted over 450 child interviews, which is her primary role at the CAC. She also observes other CAC forensic interviewers, prepares summaries of the interviews and testifies in court when subpoenaed.
Leonard was asked to explain, based on her experience as a forensic interviewer and her training, the process of disclosure:
A: So the process of disclosure is essentially how children talk about their experiences or how children talk about things that have happened to them. Not every child experiences abuse or trauma in the same way in my experience in what I have observed and that could be different-on a number of different factors.
Q. Okay. From your training have you learned that there are names for different types of disclosures?
A. Yes.
Q. And what are those names for different types of disclosures?
A. There's generally two types of disclosures; accidental disclosure, which is defined as disclosure or abuse that's revealed not on the part of the child. They haven't made-the child hasn't made that conscious decision to tell someone, which is what we would call a purposeful disclosure where that child has decided to tell someone about what's going on.
Q. Within purposeful disclosure are there subsets of types of disclosures?
A. There's different kinds of behaviors that people have-observe and I have observed as well in my experience.
Q. And what are those?
A. So when a child is disclosing they can sometimes-they can sometimes deny that abuse has occurred to them initially. They might later affirm that that has taken place. They might also talk very-in very minimal detail. They might talk in very minimal detail about what has happened to them, they might also talk in great detail or great length about what has occurred, or they might also recant or take back their previous statements.
Leonard described recanting and denial in some more detail and then was asked about delayed disclosures:
A. So delayed disclosure is if a child has come out whether it's purposeful or accidental disclosure and with some delay after an incident or an alleged incident has occurred.
Q. In your experience doing over 450 interviews, do you have a general idea of how often you see delayed disclosure?
A. A lot. I don't have exact numbers. But that is not uncommon. And in my experience, again, I don't have exact numbers for out of the 450 that I have conducted because I have seen the whole range of a child disclosing that day that the abuse has occurred and I have also seen it to the other end of the spectrum where it's been several years.
*314 Q. Would you say it is more common for you to do referral cases with delayed disclosures or more common for you to have emergency CACs?
A. More common to conduct the-typically a regularly scheduled forensic interview.
Q. Okay. And is all of this based on your experienc[e] conducting these interviews?
A. Yes.
On cross-examination, Leonard testified that it is not her job to decide if a child is telling the truth during an interview. She testified that she keeps track of how many interviews she has conducted, but does not know how many of those involved late disclosures or any details about the length of delay in cases of late disclosures. Leonard believed that such statistical data about the interviews likely exists and could be provided if requested. She reiterated that it is not uncommon for a child to delay disclosing sexual abuse for years and that she sees that situation frequently.
The State indicated that Leonard would not be asked at trial about her interview of D.M.[1] and would only be testifying generally about delayed disclosures, an area the State argued was outside the common knowledge of jurors. Leonard also would not opine whether a late disclosure indicates that the allegations therein are true. Defendant argued that Leonard's theory regarding late disclosure has not been tested, was not based on statistics and did not distinguish between delays of months versus years. Defendant referenced an article he claimed was the genesis of the theory regarding disclosures, in which the author stated that the stages of disclosure discussed therein were not based on science. Defendant argued that without statistics, peer review, an established margin of error, a scientific basis and general acceptance, Leonard's testimony was based just on her observations and did not meet the test for admissibility of an expert opinion under Daubert. Defendant also argued that the concept of delayed disclosure was within the common knowledge of the average juror, citing everyone's familiarity with the recent "me too" movement involving adult women disclosing sexual assaults from years earlier. Also, because D.M. would be sixteen or seventeen when she testified at trial, Defendant argued she could explain why she waited years to disclose Defendant's alleged conduct.
The trial court sustained Defendant's motion to exclude Leonard's testimony. There is no written order, but the court gave the following reasons for its ruling on the record:
Well, if you want to go directly to the Daubert test, I-and I understand your point that it does not have to meet all four of those prongs. Because you can have information that can be presented on a variety of topics that it just won't actually meet one of those prongs, right? Some things can be tested scientifically and some things cannot.
However, in this particular situation, I don't feel as though there's information-the narrow information that she was going to present here today would assist the jury, have any sort of specific expert value to it; and I think that before anyone can come forward and talk about, as you said social behavior is difficult to test and such, again, that sort of just is what it is. So the fact that it's difficult to test.
There is data out there with regard to all of the different things that they experienced. But the determination that, *315 therefore, this could push the jury to believe it's true because this person's coming in claiming to be an expert saying that this set of circumstances is common, is too dangerous with regard to literally tipping the jury in the wrong direction. I think it is something that the jury can handle and understand and does not need expert testimony. It does not make it more clear and does not assist the jury in reaching a verdict.
After an off-the-record conversation, the trial court added:
The other thing with regard to this particular witness on the narrow topic that she's discussing, which is whether delay is common or uncommon, that's based purely upon her observations and so there isn't any specific scientific or technical or specialized knowledge in a sense. The police officer looking through the one-way mirror would have the same information that a certain number of days passed before someone testifies, so there's nothing that she's specialized in that would assist the Jury.
This petition for a writ of prohibition followed.
Discussion
"A writ of prohibition is appropriate where there is an important question of law decided erroneously that would otherwise escape review by this Court, and the aggrieved party may suffer considerable hardship and expense as a consequence of the erroneous decision." State ex rel. Wolfrum v. Wiesman, 225 S.W.3d 409, 411 (Mo. banc 2007) (internal quotation marks and citation omitted); see also State ex rel. Jackson v. Parker, 496 S.W.3d 559, 561 (Mo. App. S.D. 2016). If this case is tried to verdict without the excluded evidence and Defendant is acquitted, the State would not have the right to appeal. Therefore, the ruling would otherwise escape appellate review and the prosecution would be hamstrung by double jeopardy concerns were we not to use a remedial writ to correct this erroneous ruling. See Parker , 496 S.W.3d at 561.
Amendments to Section 490.065
The standards governing the admissibility of expert opinions in criminal cases recently changed in Missouri with the amendment of Section 490.065, effective August 28, 2017. The previous version of Section 490.065 applied in all civil cases, but not in any criminal cases. Now, there are two subsections of Section 490.065. Subsection 1 is applicable to certain specified civil causes of actions and retains verbatim the substance of the previous version of the statute.[2] Subsection 2 applies in *316 all other cases, including criminal actions, and adopts an approach to the admissibility of expert opinions that is consistent with federal standards:
2. In all actions except those to which subsection 1 of this section applies:
(1) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) The testimony is based on sufficient facts or data;
(c) The testimony is the product of reliable principles and methods; and
(d) The expert has reliably applied the principles and methods to the facts of the case;
[ Fed. R. Evid. 702 ]
(2) An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect;
[ Fed. R. Evid. 703 ]
(3)(a) An opinion is not objectionable just because it embraces an ultimate issue; (b) In a criminal case, an expert witness shall not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone;
[ Fed. R. Evid. 704 ]
(4) Unless the court orders otherwise, an expert may state an opinion and give the reasons for it without first testifying to the underlying facts or data. But the expert may be required to disclose those facts or data on cross-examination.
[ Fed. R. Evid. 705 ]
Section 490.065.2. Each subparagraph of this subsection is taken verbatim from a Federal Rule of Evidence, identified in the brackets above.
Historical Standards for Admissibility in Missouri
Prior to the enactment of this new provision, Missouri courts followed the guidelines established in Frye v. United States , 293 F. 1013 (D.C. Cir. 1923) -as did many other jurisdictions-when determining the admissibility of scientific expert testimony in criminal cases. See State v. Hightower , 511 S.W.3d 454, 457-58 (Mo. App. E.D. 2017). The Frye test was based on whether the opinion was "generally accepted" in the relevant scientific field. See id. In Daubert v. Merrell Dow Pharmaceuticals, Inc. , the United States Supreme Court held that Frye had been superseded by the Federal Rules of Evidence. 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Missouri courts nevertheless continued to follow Frye for scientific evidence in criminal cases because Missouri did not at that time follow the federal rules. See State v. Davis, 860 S.W.2d 369, 375 n.1 (Mo. App. E.D. 1993). In determining the admissibility *317 of non-scientific expert testimony in criminal cases, Missouri courts have been assisted by general principles regarding expert testimony, asking whether the testimony would assist the jury because the subject is an area outside of their experience or knowledge. See State v. Williams, 858 S.W.2d 796, 798 (Mo. App. E.D. 1993). Admissibility of non-scientific expert testimony in child sex cases also has depended on whether the testimony was about generalized behaviors commonly found in victims of sexual abuse or was particularized testimony concerning a specific victim's credibility. See State v. Churchill, 98 S.W.3d 536, 539 (Mo. banc 2003). Trial courts have had broad discretion in admitting generalized testimony, but particularized testimony has been deemed inadmissible "because it usurps the decision-making function of the jury." Id.[3]
Standards for Admissibility in Federal Law
Section 490.065.2 adopts the Federal Rules of Evidence word-for-word, and therefore federal precedent construing those rules is strong persuasive authority for how we should view admissibility under our statute. See Huffman v. State, 703 S.W.2d 566, 568 (Mo. App. S.D. 1986). As noted above, the United States Supreme Court held in Daubert that the federal rules superseded previous common law standards in Frye and it made clear that trial courts must act as gatekeepers to ensure that the testimony sought to be admitted under Federal Rule of Evidence 702 is "not only relevant, but reliable." 509 U.S. at 589, 113 S.Ct. 2786. At the time, Rule 702 provided: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Whether the testimony will ''assist the trier of fact'' is simply a question of relevance, namely, whether the testimony is helpful to the jury because it has a valid connection to the case. Id. Reliability, on the other hand, is determined by many factors, and the Court declined to set forth a definitive checklist or test of reliability. Id. at 593, 113 S.Ct. 2786. Nevertheless, it made the following "general observations"-ever after known as the " Daubert factors"-about what a court may consider when determining the reliability of an expert's testimony: (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied and the existence and maintenance of standards and controls; and (4) whether the technique or theory has been generally accepted in the scientific community. Id. at 593-94, 113 S.Ct. 2786.
The Daubert Court described the inquiry trial courts must engage in as "flexible" and cautioned that courts should focus on relevance and reliability while being mindful of the other applicable rules of evidence, including weighing possible prejudice against probative force. Id. at 594-95, 113 S.Ct. 2786. The trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system:
*318 "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Id. at 595, 113 S.Ct. 2786. This is consistent, the Court said, with the "liberal thrust" of the rules and their "general approach of relaxing the traditional barriers to opinion testimony." Id. at 588, 113 S.Ct. 2786 (internal quotation marks and citations omitted).
In the 1999 case of Kumho Tire Company v. Carmichael , the United States Supreme Court clarified that the general principles stated in Daubert apply to the admission of all expert testimony under Rule 702, not only scientific testimony as was at issue in Daubert. 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). But, it held, the specific Daubert factors may or may not be considered by a trial court in determining the reliability of non-scientific expert testimony:
[T]he factors identified in Daubert may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in Daubert, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.
Id. (internal quotation marks omitted). The Kumho Court said that the objective of the trial court's gatekeeping function under Daubert is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152, 119 S.Ct. 1167.
In 2000, Federal Rule of Evidence 702 was amended in response to Daubert , Kumho and their progeny. The amendment rearranged the original language of Rule 702 and added new language. It is this version of the rule that was adopted in Section 490.065.2; subparagraphs (1) and (1)(a) contain the rearranged original language and subparagraphs (b)-(d) contain the language that was added in the amended Rule 702 :
(1)A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) The testimony is based on sufficient facts or data;
(c) The testimony is the product of reliable principles and methods; and
(d) The expert has reliably applied the principles and methods to the facts of the case.
"The amendment [to Rule 702 ] affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony." Advisory Committee Notes , Fed. R. Evid. 702 (2000). The amended rule does not codify the Daubert factors, but is "broad enough to require consideration of any or all of the specific Daubert factors where appropriate." Id. Other factors may also be relevant, but "no single factor is necessarily dispositive of the reliability of a particular expert's testimony." Id. (citing cases in which courts considered other non- Daubert factors). Thus, while the rule enumerates some considerations, the inquiry *319 about admissibility is still intended to be flexible. Several federal circuits boil the gatekeeping function of trial courts under Federal Rule of Evidence 702 down to its essence in a useful three-part test: (1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable. See Johnson v. Mead Johnson & Company, LLC, 754 F.3d 557, 561 (8th Cir. 2014) ; Adams v. Laboratory Corporation of America, 760 F.3d 1322, 1328 (11th Cir. 2014) ; United States v. Keszey, 643 Fed.Appx. 153, 158 n.3 (3d Cir. 2016) ; Ed Peters Jewelry Company v. C & J Jewelry Company, 124 F.3d 252, 259 (1st Cir. 1997).
Admissibility in Criminal Cases under Section 490.065.2
We have considered the above jurisprudence in interpreting, for the first time, the newly adopted standards in Section 490.065.2. Borrowing the condensed three-part test of the above federal circuits, admissibility of expert testimony under Section 490.065.2 requires simply that it be relevant and reliable and proffered by a qualified expert. An expert is qualified by her "knowledge, skill, experience, training, or education." Section 490.065.2(1). Her testimony is relevant if it contains specialized knowledge-either scientific, technical or otherwise-that will assist the trier of fact. Section 490.065.2(1)(a). Reliability is determined by considering whether the testimony is based on sufficient facts or data, reliable principles and methods and reliable application thereof. Section 490.065.2(1)(b)-(d). But, as with the federal rule, no single factor is necessarily dispositive of the reliability of a particular expert's testimony. The trial court may consider Daubert factors or other factors depending on the nature of the testimony at issue.
The adoption of the federal rules in Section 490.065.2 makes clear that Frye -superseded by those very same rules and no longer followed by federal courts-should no longer be followed in Missouri either. Though this is a significant departure from the way our courts have handled scientific expert testimony in criminal cases, the enactment of Section 490.065.2 does not necessarily completely transform how Missouri courts have treated non-scientific expert testimony in criminal cases. Importantly for this case, the relevance analysis remains unchanged. Relevance under Section 490.065.2 depends on whether the testimony contains specialized knowledge that will assist the trier of fact to understand the evidence. This is substantively the same relevance analysis our courts have been employing, particularly in child sex cases: whether "the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence." Williams, 858 S.W.2d at 798. Under that standard, it has long been held in Missouri that generalized testimony about the behaviors of children alleging sexual abuse is specialized knowledge and that it is helpful to juries.
"The general purpose of expert testimony is to assist the jury in areas that are outside of everyday experience or lay experience. State v. Rogers , 529 S.W.3d 906, 911 (Mo. App. E.D. 2017). State v. Williams was the first case to recognize that expert testimony about how a child behaves is relevant in a sex case precisely because that topic is an area outside an ordinary juror's experience:
We cannot assume the average juror is familiar with the behavioral characteristics of victims of child molesting. Knowledge of such characteristics may well aid the jury in weighing the testimony of the alleged child victim. Expert testimony in child abuse cases plays a useful *320 role by disabusing the jury of some widely held misconceptions about rape and rape victims, so that it may evaluate the evidence free of the constraints of the popular myths. Principally, general profile evidence has been accepted to explain victim behavior that might appear unusual to a lay juror, not, however, to prove that sexual abuse occurred.
858 S.W.2d at 799. Since then, it has become "generally accepted" that this type of testimony is admissible "because it assists the jury in understanding the behavior of sexually abused children, a subject beyond the range of knowledge of the ordinary juror." State v. Baker , 422 S.W.3d 508, 514 (Mo. App. E.D. 2014) (internal quotation marks omitted) (citing State v. Thomas , 290 S.W.3d 129, 135 (Mo. App. S.D. 2009) and State v. Bowler , 892 S.W.2d 717, 720 (Mo. App. E.D. 1994) ). Though the expert cannot comment on the veracity of witnesses-that being a matter for the jury alone to determine-her generalized testimony on this topic can assist the jury in making that credibility assessment of a child alleging sexual abuse. See Baker, 422 S.W.3d at 513. Regarding the behavior of delayed disclosure, our courts have said that when assessing an alleged victim's credibility, juries are "unlikely to know, in the absence of expert testimony," that children disclose differently than adults and it is a matter outside a jurors' range of knowledge. State v. Tillitt, 552 S.W.3d 571, 581, 2018 WL 325222, at *6 (Mo. App. W.D. Jan. 9, 2018) ; see also State v. Chaidez, 543 S.W.3d 664, 669-70 (Mo. App. S.D. 2018) ; State v. Walker, 549 S.W.3d 7, 14 (Mo. App. W.D. 2018).[4]
Thus, the process of disclosure-including that it is common for children to delay disclosure-is a subject beyond the range of knowledge of the ordinary juror and one that is helpful for jurors in a case involving a child's allegations of sex abuse. In the parlance of Section 490.065.2, expert testimony on this matter is "specialized knowledge" that will "assist the trier of fact to understand the evidence." Though the holdings in the above cases pre-date the new statute, they remain precedential because the conclusions therein were drawn under a standard of relevance that is essentially no different than the one in the new statute. There is nothing to suggest that by adopting the federal rules of evidence, the legislature intended to undermine what the above case law has firmly established.
Erroneous Exclusion of Leonard's Testimony
Here, the primary reason for finding Leonard's testimony inadmissible was the trial court's erroneous conclusion that it was not specialized knowledge that would assist the jury in any way. In other words, the court determined it was not relevant. As noted above, the trial court stated it did not believe Leonard's testimony "would assist the jury, have any sort of specific expert value to it." The court indicated that delayed disclosure was not beyond the jury's ability to understand and the jury did not need expert testimony on *321 the subject. These conclusions are totally at odds with the firmly established and still applicable case law above, all of which dictates that expert testimony about delayed disclosure is outside the jury's common knowledge and will assist the jury in understanding a child victim's delay in disclosure.
The trial court also indicated that Leonard's testimony was not necessary here because the victim D.M. would testify at trial and, at sixteen or seventeen, would be able to adequately explain her reasons for delaying. But the victims in both Walker and Chaidez were teenagers like D.M., or older, at the time of trial and testified about the reasons they delayed disclosure, which did not seem to impact the courts' conclusions that expert testimony on the matter of disclosure was admissible. Similarly misplaced is the court's statement that Leonard's testimony was not specialized because it was based purely upon her observation. The experts in Baker and Chaidez were forensic interviewers with backgrounds similar to Leonard. See Baker , 422 S.W.3d at 511 (expert had bachelor's and master's degrees in social work, was licensed clinical social worker, completed children's interview training program and has participated in numerous conferences on topic of interviewing children and had conducted almost 700 interviews); Chaidez, 543 S.W.3d at 668 (expert had been interviewing child victims of sexual abuse for 18 years and had thousands of interactions with those victims). Their testimony that it was not uncommon for children to delay disclosing allegations of abuse was, like Leonard's, based on observations they made in the course of their experience as forensic interviews. That fact had no impact on those courts' conclusion that the expert had specialized knowledge that would assist the jury.
Moreover, the court's reliance on Leonard's lack of something other than personal observations to support her opinion is contrary to the plain language of the statute. Section 490.065.2(1) expressly contemplates that an expert may be qualified on the basis of experience alone. See also United States v. Roach, 644 F.3d 763, 764 (8th Cir. 2011) (rejecting argument that expert not qualified under Federal Rule of Evidence 702 because he lacked formal education or training and his knowledge was derived solely from on-the-job observations and attendance at conferences and seminars). The statute also expressly contemplates that an expert may base her opinion on "facts or data in the case that the expert has been made aware of or personally observed. " Section 490.065.2(2) (emphasis added). Leonard's opinion was based on facts she personally observed in her professional experience conducting over 450 interviews as a forensic interviewer. There is nothing per se unreliable about testimony based on personal observations made in the course of an expert's professional experiences. "[N]o one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." Kumho, 526 U.S. at 156, 119 S.Ct. 1167. In fact, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Advisory Committee Notes , Fed. R. Evid. 702 (2000). The trial court here recognized that very fact when it noted that "some things can be tested and some things cannot" and stated that "social behavior" is difficult to test. But the court did not determine that the testimony was unreliable for that reason, nor did it consider any of the other factors that might have impacted reliability here. The trial court's ruling did not hinge on Leonard's qualifications or the reliability of her testimony at all. Rather, the lynchpin of the ruling is the erroneous conclusion that Leonard's testimony was not relevant in the first place.
*322 The court also expressed concern that allowing Leonard to testify that delayed disclosure is common might put a "cloak of believability" on D.M.'s delayed disclosure and push the jury to find D.M.'s allegations truthful. The danger that an expert's testimony might lend what other courts have called "scientific cachet" to the issue of credibility only exists if the testimony comments explicitly or implicitly on the particular victim's credibility. Thus, generalized testimony about the common behavior of delayed disclosure is proper, but an opinion about whether a victim is or is not lying if a generalized behavior is exhibited is not proper because it would lend "scientific cachet on the central issue of the victim's credibility." State v. Ellis , 512 S.W.3d 816, 839 (Mo. App. W.D. 2016) ; see also Walker , 549 S.W.3d at 14 (because expert did not offer opinion explicitly or implicitly on victim's credibility and only testified to generality that children do not disclose sexual abuse right away, expert never "lent a 'scientific cachet' on the central issue of credibility"). Again, the trial court's role as gatekeeper under the federal rules and our statute is not intended to serve as a replacement for the adversary system. The trial court's and Defendant's concerns can and should be addressed on cross-examination, not by outright exclusion of Leonard's testimony before trial.
Conclusion
We cannot know precisely how the evidence will come in at trial, though we anticipate Defendant may challenge the truthfulness of D.M.'s allegations based in part on the fact that she delayed disclosing them. The record indicates that the trial court believed that would be part of the defense when it made its pre-trial ruling, and Defendant never argued that Leonard's testimony was not relevant because be had no intention of arguing that D.M.'s delay in disclosure calls her credibility into question. We make no comment about admissibility rulings the trial court will be faced with at the trial. All we can say at this juncture is that it was error for the trial court to rule out the possibility that Leonard's testimony could ever be relevant. The trial court's ruling is contrary to the plain language of Section 490.065.2 and is a significant departure from Missouri precedent regarding expert testimony in child sex cases, a result that was not intended by the adoption of Section 490.065.2.
We therefore make our preliminary order in prohibition permanent. The respondent, Honorable Clinton R. Wright, is directed to set aside his decision granting the motion to exclude Leonard's testimony. Any further action regarding the admissibility of her testimony shall be taken in accordance with this opinion.
Lisa P. Page, J., concurs.
Lawrence E. Mooney, J., concurs.

D.M. was over fourteen at the time of her interview, and thus the provisions of Section 491.075 do not apply to the statements she made therein.

Section 490.065.1:
In actions brought under chapter 451, 452, 453, 454, or 455 or in actions adjudicated in juvenile courts under chapter 211 or in family courts under chapter 487, or in all proceedings before the probate division of the circuit court, or in all actions or proceedings in which there is no right to a jury trial:
(1) If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise;
(2) Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact;
(3) The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable;
(4) If a reasonable foundation is laid, an expert may testify in terms of opinion or inference and give the reasons therefor without the use of hypothetical questions, unless the court believes the use of a hypothetical question will make the expert's opinion more understandable or of greater assistance to the jury due to the particular facts of the case.

Although Section 490.065.2 applies to both criminal and civil cases not covered by Section 490.065.1, we limit our discussion here to its application in criminal cases as that is the only matter before us. But we note that prior to the amendment of that statute, trial courts in civil cases were instructed by State Board of Registration for Healing Arts v. McDonagh to follow Section 490.065 as it existed at the time and not Daubert, Frye or some other standard. 123 S.W.3d 146, 153 (Mo. banc 2003). We suspect that holding is implicated by the amendments to that statute.

There is support for this proposition in federal cases decided under the federal rules we adopted as well. "In the context of child abuse cases, a qualified expert can inform the jury as to behavioral characteristics of sexually abused children in general." United States v. Betcher, 534 F.3d 820, 826 (8th Cir. 2008) (expert testimony about delayed disclosure helped jury understand why alleged victims of child pornography did not reveal they had been photographed until shown photos and also helped explain initial denial that photographs were taken and refusal to disclose who was involved); see also United States v. Young, 623 F. App'x 863, 866 (9th Cir. 2015) (forensic interviewer, based on her experience and training, had specialized knowledge about process of disclosure and her testimony about "general behavioral characteristics" of child sexual-abuse victims was not improper bolstering).