

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD81911 |
| | ) | |
| LEWIS C. MARSHALL, | ) | FILED: February 25, 2020 |
| Appellant. | ) | |

**Appeal from the Circuit Court of Buchanan County**
**The Honorable Patrick K. Robb, Judge**

**Before Division Three: Alok Ahuja, P.J., and**
**Gary D. Witt and Anthony Rex Gabbert, JJ.**

Following a jury trial in the Circuit Court of Buchanan County, Lewis Marshall was convicted of the unclassified felony of sodomy, in violation of § 566.060, RSMo, and the class D felony of sexual abuse in the first degree, in violation of § 566.100, RSMo. Marshall appeals. He argues that the circuit court abused its discretion in admitting expert testimony concerning delayed disclosure of sexual abuse by child victims. Marshall argues that the testimony was inadmissible because it was not based on the application of reliable principles and methods, as required by § 490.065.2(1)(c) and (d), RSMo. We affirm.

## Factual Background

Marshall's victim is a male who was born in 1985. Marshall married Victim's mother in 1986. Although Marshall was not Victim's biological father, Victim grew up believing that he was. Marshall and Victim's mother divorced after approximately sixteen years of marriage.

Around Thanksgiving 2016, Victim was gathered with other relatives at his mother's house. The group was discussing spending the night at Victim's mother's house. Victim's niece stated she could not stay because, if she did, she would miss "special tickle time with Grandpa [(meaning Marshall)]." Marshall had legal guardianship over the niece at the time.

Victim was concerned about his niece's statement, because of Marshall's actions toward Victim when Victim was growing up. Victim decided to disclose those events to his family and then to authorities.

Victim's disclosures led to Marshall being charged with one count of sodomy and one count of sexual abuse. The Third Amended Felony Information on which Marshall was tried alleged that he had committed the offense of sodomy between October 1, 1993 and November 1, 1993, by putting his genitals in Victim's mouth at a time when Victim was less than fourteen years old. The information alleged that Marshall had committed the offense of first-degree sexual abuse by touching Victim's anus with his hand between October 1, 1990 and January 2, 1991, at a time when Victim was less than twelve years old.

The case proceeded to a jury trial in April 2018. Victim was 32 years old at the time of trial. He testified that Marshall was frequently physically abusive to his mother, his siblings, and to Victim when they lived as a family. Victim testified about an incident of sexual abuse which occurred in Buchanan County on New Year's Eve of 1990, when Victim was five years old. During that incident Marshall put his finger inside Victim's anus, and simultaneously masturbated. Victim testified that on another occasion on Victim's eighth birthday, Marshall forced Victim to perform oral sex on him at a used car lot where Marshall worked in Buchanan County. Victim testified about two additional incidents of sexual abuse that occurred in Hamilton and in Kansas, where Marshall put his penis and a drum

stick in Victim's anus. After each incident, Marshall told Victim that he would die if he told anyone what had happened.

Victim testified that the last incident of abuse he could remember occurred when he was approximately sixteen or seventeen years old (*i.e.*, in approximately 2001 or 2002). Victim was home with his girlfriend. Marshall saw Victim's girlfriend kissing him. Marshall threw Victim into a bathroom, locked the door, and undid his pants. Marshall told Victim to "get him hard," and then said that he would show Victim's girlfriend "what a real man was." Victim fought back and left the house with his girlfriend.

Marshall admitted he engaged in some physical abuse of his children but denied all allegations of sexual abuse.

During trial the State presented several witnesses who testified to uncharged acts of sexual abuse which Marshall had committed against them. This evidence was admitted under Article I, § 18(c) to the Missouri Constitution, to prove Marshall's propensity to engage in the conduct for which he was on trial. The uncharged acts testimony concerned sexual abuse which had occurred years or even decades earlier, in most instances when the witnesses were minors.

At trial, the State also presented expert testimony from Joyce Estes. Estes is a licensed clinical social worker. She worked as a counselor and program director at Northwest Missouri Children's Advocacy Center in St. Joseph from 1993 to 2004, when she became the Center's Director. Estes retired as Director of the Children's Advocacy Center in November 2017. Estes has a master's degree in counseling. She testified that her specialty was counseling children who had been sexually, physically, or emotionally abused, or adults who had experienced such abuse as children; her "primary focus" was sexual abuse. Estes had counseled over 1,000 children and testified as an expert witness 40 times in child abuse cases. She testified that she had extensive education in the areas of childhood trauma,

3

childhood sexual abuse, and techniques for interviewing children about abuse. A significant part of her training concerned the process by which children disclose sexual abuse.

Estes had not met or counseled Victim or any of the other witnesses who testified to sexual abuse by Marshall. She instead testified to the behavior of child sexual abuse victims generally. Estes testified that children disclose abuse within one year of it occurring in only approximately 25% of cases; these early disclosures typically occur where the abuser is a stranger and non-family member. Another 25% of victims do not disclose sexual abuse until very late in life. Estes referred to a study in which 43% of the children who displayed medical evidence of sexual abuse, such as a sexually transmitted disease, did not disclose any abuse. A familial or close personal relationship between the abuser and the victim made it less likely that the victim would disclose the abuse promptly. Victims do not disclose the abuse, or delay their disclosures, due to fear, shame, guilt, and a lack of self-confidence. Estes testified that, if a child makes an initial disclosure and receives a hostile, unsympathetic or ineffective response, they may delay any further disclosure for an extended period. Estes also testified that a child may continue to have affectionate feelings for an abuser with whom the child has a close personal relationship, and may hesitate to disclose abuse by that person from fear of endangering the relationship. In those instances, she testified that the child may attempt to mentally segregate the abuse from other, positive aspects of their relationship with the perpetrator.

The jury found Marshall guilty on both counts. The court sentenced him to life imprisonment for the sodomy count, and a concurrent term of four years' imprisonment on the sexual abuse count. Marshall appeals.

4

## Standard of Review

The trial court has broad discretion to admit or exclude evidence at trial. We review the trial court's ruling on the admission of evidence for an abuse of that discretion. That discretion is abused when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration.

*State v. Suttles*, 581 S.W.3d 137, 145 (Mo. App. E.D. 2019) (citations and internal quotation marks omitted).

## Analysis

Marshall argues that Joyce Estes should not have been permitted to testify as an expert that child sex-abuse victims frequently delay their disclosure of the abuse. Marshall argues that Estes' testimony was inadmissible because the State failed to demonstrate that her testimony was "the product of reliable principles and methods," and that Estes had "reliably applied the principles and methods," within the meaning of § 490.065.2(1)(c) and (d), RSMo. We disagree.

"Prior to 2017, Section 490.065 applied a standard for the admissibility of expert testimony similar to that found in *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)." *Suttles*, 581 S.W.3d at 146 (citations omitted). Section 490.065 was amended effective August 28, 2017. *Id.* As relevant to this proceeding, § 490.065.2(1) now provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) The testimony is based on sufficient facts or data;

(c) The testimony is the product of reliable principles and methods; and

(d) The expert has reliably applied the principles and methods to the facts of the case.

5

"The language of Sections 490.065.2(1)–(2) are now identical in their language to [Federal Rules of Evidence] 702–703." *Suttles*, 581 S.W.3d at 146. "This Court since has held that because the language of Section 490.065 now mirrors FRE 702 and 703, and because FRE 702 and 703 are interpreted under *Daubert* and its progeny, the cases interpreting those federal rules remain relevant and useful in guiding our interpretation of Section 490.065." *Id.* (referencing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 593–94 (1993)).

Federal Rule of Evidence 702, on which § 490.065.2 is patterned, "'affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony.'" *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 318 (Mo. App. E.D. 2018) (quoting Advisory Committee Note to FED. R. EVID. 702 (2000)).

> Several federal circuits boil the gatekeeping function of trial courts under Federal Rule of Evidence 702 down to its essence in a useful three-part test: (1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable.

*Id.* at 319 (citations omitted).

Marshall does not argue that Estes was not qualified. Nor does he argue that Estes' testimony was not relevant. *See Wright*, 562 S.W.3d at 320 (finding that testimony of forensic interviewer regarding delayed disclosure by child sex-abuse victims "is 'specialized knowledge' that will 'assist the trier of fact to understand the evidence'"); *see also Suttles*, 582 S.W.3d at 147–49 (same).

Marshall's argument on appeal is focused on the reliability of Estes' testimony. In making this argument, Marshall emphasizes the factors enumerated in *Daubert* to assess the reliability of scientific testimony:

> (1) whether the expert's technique or theory can be or has been tested; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied and the existence and maintenance

6

of standards and controls; and (4) whether the technique or theory has been generally accepted in the scientific community.

*Wright*, 562 S.W.3d at 317 (citing *Daubert*, 509 U.S. at 593–94).

Although § 490.065.2 is patterned after Federal Rule of Evidence 702, and the Supreme Court of the United States interpreted Rule 702 in *Daubert*, this Court has held that "the *Daubert* factors themselves are not controlling" in applying § 490.065.2. *Suttles*, 581 S.W.3d at 147 (citing *Wright*, 562 S.W.3d at 318–19). The Advisory Committee Note to the 2000 amendment of Federal Rule of Evidence 702 makes clear that the Rule does <u>not</u> mandate that all expert testimony satisfy the *Daubert* factors:

> No attempt has been made to "codify" these specific factors. *Daubert* itself emphasized that the factors were neither exclusive nor dispositive. Other cases have recognized that not all of the specific *Daubert* factors can apply to every type of expert testimony. The standards set forth in the amendment are broad enough to require consideration of any or all of the specific *Daubert* factors where appropriate.

(Citations omitted.)

The Supreme Court of the United States itself recognized that the *Daubert* factors may not be relevant where experts testify based on "technical" or "other specialized knowledge," rather than based on strictly "scientific" knowledge:

> [T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. The conclusion, in our view, is that we can neither rule out, nor rule in, for all cases and for all time the applicability of the factors mentioned in *Daubert*, nor can we now do so for subsets of cases categorized by category of expert or by kind of evidence. Too much depends upon the particular circumstances of the particular case at issue.

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999) (citation and internal quotation marks omitted); *see also Suttles*, 581 S.W.3d at 147 (citing *Wright*, 562 S.W.3d at 318–19); *Jones v. City of Kansas City*, 569 S.W.3d 42, 53–54 (Mo. App. W.D. 2019).

7

It is also significant that, because of the prohibition on "particularized" expert testimony concerning the behavior of a child sex-abuse victim,[1] Estes testified only to behaviors *generally* seen in victims of childhood sexual abuse. Estes did <u>not</u> offer any opinion as to whether Victim exhibited these behaviors *in this case*. The Advisory Committee Note to Rule 702 recognizes that this sort of "generalized" testimony may be subject to a different reliability analysis than testimony which seeks to apply general principles to the specific facts in litigation:

> If the expert purports to apply principles and methods to the facts of the case, it is important that this application be conducted reliably. Yet it might also be important in some cases for an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case. For example, experts might instruct the factfinder on the principles of thermodynamics, or bloodclotting, or on how financial markets respond to corporate reports, without ever knowing about or trying to tie their testimony into the facts of the case. The amendment does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Marshall's argument emphasizes several *Daubert* factors which have limited relevance here, given the nature of Estes' expertise and testimony, and because she did not attempt to apply her opinions to the specific facts of this case. Thus, in this context it is not particularly meaningful to question the testing or replicability of Estes' analysis, the error rate of that analysis, or the standards and controls governing the application of that analysis. A different reliability analysis is appropriate with respect to this sort of non-scientific, generalized testimony, which is based on the expert's specialized knowledge. In a case involving similar expert

---

[1] *See generally State v. Churchill*, 98 S.W.3d 536, 539 (Mo. 2003); *Suttles*, 581 S.W.3d at 148–49; *State v. Ferguson*, 568 S.W.3d 533, 543–44 (Mo. App. E.D. 2019).

testimony concerning delayed disclosure of childhood sexual abuse, the Eastern District in *Suttles* emphasized that,

> Testimony is reliable under Section 490.065.2 if it is based on sufficient facts or data, reliable principles and methods and reliable application thereof.  No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.  As long as an expert's testimony rests upon good grounds, based on what is known[,] it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset.

581 S.W.3d at 150 (citations and internal quotation marks omitted).  Similarly, the Texas Court of Appeals held that the reliability of similar testimony of a licensed professional counselor and trained forensic interviewer should be evaluated by asking if "(1) the field of expertise is a legitimate one, (2) the subject matter of the expert's testimony is within the scope of that field, and (3) the expert's testimony properly relies on and/or utilizes the principles involved in the field." *Reynolds v. State*, 227 S.W.3d 355, 371 (Tex. App. 2007) (citations omitted).[2]

In *Suttles*, the Eastern District concluded that expert testimony concerning delayed disclosures was sufficiently reliable because, "[a]lthough the delayed-disclosures theory is not easily subject to peer review and/or publication under the *Daubert* factors, scientists generally accept the theory to explain a common behavior seen in child-victims of sexual abuse."  581 S.W.3d at 151 (citing *State v. J.L.G.*, 190

---

[2]    The Advisory Committee Note to the 2000 amendment to Federal Rule of Evidence 702 makes this same point:

> Some types of expert testimony will be more objectively verifiable, and subject to the expectations of falsifiability, peer review, and publication, than others.  Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.  The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded.

9

A.3d 442, 445–46 (N.J. 2018)). The Court noted that "the theory of delayed disclosures . . . has long been accepted by well-recognized experts as a behavior in victims of child abuse." *Id.* The Court also emphasized the expert's extensive personal experience with minor sexual abuse victims, noting that the expert's "own experience interviewing children was consistent with the scientifically reported behavior of delayed disclosures." *Id.* at 151–52. Other cases applying similar admissibility standards have found that expert testimony concerning delayed disclosures, by therapists who have reviewed academic literature and have extensive personal experience counseling sex-abuse victims, is sufficiently reliable to be admitted in a criminal trial. *See, e.g.*, *Wright*, 562 S.W.3d at 321; *State v. Shore*, 814 S.E.2d 464, 469–74 (N.C. App. 2018); *State v. Jones*, 817 S.E.2d 268, 272 (S.C. 2018); *People v. Spicola*, 947 N.E.2d 620, 636 (N.Y. 2011); *Reynolds*, 227 S.W.3d at 371–72.

In this case, Estes had extensive personal experience counseling child sexual abuse victims. She also testified to extensive training and education concerning the process by which children disclose and process sexual abuse. Finally, during her trial and pre-trial testimony, she referenced academic literature supporting her opinion that delayed disclosure is common among child victims of sexual abuse. In addition, prior to trial the State provided the circuit court three different empirical peer-reviewed studies published between 2000 and 2013 regarding the frequency of delayed disclosure, the reasons for such delayed disclosure, and the identity of those to whom abuse is eventually disclosed. The circuit court did not abuse its discretion in allowing Estes to provide generalized testimony concerning behaviors commonly found in child sex-abuse victims, based on her extensive experience and training.[3]

---

[3] In his Brief, Marshall also attacks the reliability of the counseling techniques that Estes employed with her own patients. Those arguments are misdirected. Estes' trial testimony did not relate to the appropriateness or efficacy of any particular counseling

We close by emphasizing that "[t]he trial court's role as gatekeeper" under § 490.065 "is not intended to serve as a replacement for the adversary system." *Suttles*, 581 S.W.3d at 150 (quoting *Wright*, 562 S.W.3d at 317). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

**Conclusion**

We affirm the judgment of the circuit court.

_____

Alok Ahuja, Judge

All concur.

---

methods. Instead, her testimony related solely to the behaviors exhibited by victims of childhood sexual abuse.